Filed 4/18/22

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C084169 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 62129389B, 62129389C) |
| v. | |
| ROMAN ANDREYEVICH GLUKHOY et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Placer County, Nichols, Judge. Affirmed.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant, Roman Glukhoy.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant, Ruslan Glukhoy.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Julie A. Hokans, Supervising Deputy Attorneys

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts I – VI and VIII – XI of the Discussion.

1

General, Marcia A. Fay and Jamie A. Scheidegger, Deputy Attorneys General, for Plaintiff and Respondent.

Twin brothers, Roman and Ruslan Glukhoy, led police on two high speed chases, the second of which was in a stolen truck and culminated in a fatal collision killing two people.  Separate juries found them guilty of multiple offenses and allegations.[1]  Ruslan, who was convicted of first degree murder with felony-murder special-circumstances, was sentenced to two terms of life without the possibly of parole.  Roman, who was convicted of two counts of second degree murder, was sentenced to 30 years to life.

On appeal, Ruslan raises four contentions:  (1) insufficient evidence supports his residential burglary conviction; (2) insufficient evidence supports his conviction for aiding and abetting Roman's evasion with wanton disregard; (3) the trial court erred in excluding expert testimony regarding regressed brain development in youth; and (4) the court erred in denying his motion to continue in order to make a showing of jury misconduct.  In the unpublished portion of this opinion, we reject Ruslan's contentions and affirm the judgment as to him.

Roman raises five contentions:  (5) the convictions for evading a peace officer with wanton disregard and conspiracy to commit theft must be reversed because his trial counsel inappropriately conceded those counts in closing argument; (6) the murder verdicts must be reversed in light of Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), which abrogated the natural and probable consequences doctrine for murder; (7) the trial court failed to instruct that an aider and abettor, liable under the natural and probable consequences doctrine, can be guilty of a lesser offense than the perpetrator; (8)

---

[1]  The prosecution had moved for dual juries to present evidence of statements that Roman and Ruslan had independently given to law enforcement.  (See *People v. Aranda* (1965) 63 Cal.2d 518, abrogated in part by Cal. Const., art. I, § 28, subd. (d); *Bruton v. U.S.* (1968) 391 U.S. 123 [20 L.Ed.2d 476].)

the court abused its discretion in imposing consecutive terms for the two murders; and (9) remand is required for a *Franklin*[2] hearing. In a supplemental brief, Roman contends (10) remand is required in light of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), and (11) the abstract of judgment must be corrected to accurately reflect an imposed fee. In a second supplemental brief, Roman asserts that based on Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill 775), he need not file a Penal Code section 1170.95[3] petition to obtain Senate Bill 1437 relief and we must reverse his second degree murder convictions and vacate the sentence.

In the published portion of this opinion, we conclude that the alternative-theory instructional error in Roman's case brought about Senate Bill 1437 was harmless beyond a reasonable doubt because the evidence establishing the valid theory of direct aiding and abetting implied malice was overwhelming. In addition, that evidence was the same evidence the jury had to have credited to find defendant guilty based on the now invalid natural and probable consequences theory. In the unpublished portion of this opinion, we reject Roman's other contentions and affirm the judgment as to him.

### FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution's Case

#### The Thefts from Vehicles

In the early morning hours, twin brothers Roman and Ruslan Glukhoy, along with a friend, drove in the rain to Auburn to steal from unlocked cars parked on the street.

---

[2] *People v. Franklin* (2016) 63 Cal.4th 261, 278 (*Franklin*).

[3] Undesignated statutory references are to the Penal Code.

Auburn residents soon grew suspicious and called the police. Responding Auburn Police officers saw several suspects return to a BMW automobile parked in a cul-de-sac.[4] An officer approached the BMW with his gun drawn and held in a low-ready position. He ordered the occupants to show their hands. One passenger, Ruslan, put his hands out the front passenger-side window and raised them. The driver, Roman, however, did not. As the officer approached the back of the driver's door, the BMW sped off. The BMW then made a U-turn in the cul-de-sac, then accelerated "straight towards" the officers and their patrol units, causing one of them to think the BMW was going to run over him. He took cover behind a patrol unit. Then, at the last second, the BMW veered away, jumping the curb onto residential lawns, crossing a driveway, before reentering the roadway and speeding away.[5]

**The First Evasion and Pursuit & Theft of the Truck**

Thereafter, Roman led police on a high-speed chase, and at various points drove in the direction of officers, ran a stop sign, spun out, drove without lights, and entered Interstate 80 where he reached a speed of approximately 125 miles per hour. This initial chase ended when Roman, trying to make an abrupt freeway exit in Loomis, missed the ramp, spun out and collided into an embankment in a landscaped area. One officer described the collision as "a violent crash. The vehicle was tore up pretty good." Another described it as "extremely violent." This collision took place at 5:12 a.m.

---

[4] About an hour and half before seeing the BMW in the cul-de-sac, officers had seen the same vehicle parked on another residential Auburn street. At that time, the vehicle was unoccupied and the hood, front-brake rotors, and tailpipe were cold to the touch.

[5] One officer testified the BMW was approximately 40 to 50 feet away when it veered away. The other officer testified that when the BMW veered away, he was no longer in danger of being hit.

By the time the officers reached the BMW, Roman, Ruslan, and their friend had escaped.[6] Placer County Sheriff's deputies were in foot pursuit. Around an hour later, law enforcement was alerted that a Ford F-150 pick-up truck had been stolen from a neighborhood not far from the BMW's crash site.[7] Ruslan was driving, with Roman in the rear passenger seat. A second high-speed chase ensued.

**The Second Evasion and Pursuit & the Fatal Crash**

This pursuit included a freeway sprint on Interstate 80 toward Sacramento up to 120 miles per hour through early morning rush hour traffic. During the freeway pursuant, Ruslan made several unsafe lane changes to get around traffic. When the traffic got heavier and began to slow, Ruslan drove the truck from the number one lane onto the emergency lane next to the center divider. One of the pursuing deputies called this the "suicide lane." He described the traffic as "pretty heavy," adding "we're getting into rush hour traffic, a lot of vehicles headed to work." Utilizing the suicide lane, Ruslan passed the traffic in the number one lane. At one point, the pickup moved into the diamond lane, where there was no traffic. As the two brothers approached Antelope Road, the traffic began to spread out and Ruslan abruptly cut across the freeway lanes to the exit at Antelope Road. He then ran a series of red lights on Antelope Road, driving 80 to 90 miles per hour. It was then approximately 6:30 a.m. The chase ended when Ruslan ran a red light at high speed and collided with a small Kia, killing its two occupants. The pursuit of the truck lasted approximately eight or nine minutes. We discuss the portion of the pursuit from the Interstate 80 exit, down Antelope Road to the collision site in more detail in Discussion part V, *post*.

---

[6] The friend was separately apprehended and found with $941 in his pocket.

[7] The prosecution alleged that the keys to the truck were taken in a residential burglary that took place after defendants fled from the BMW crash and before the truck was stolen.

**The Arrests and Statements to Law Enforcement**

Ruslan and Roman then ran from the crash site without checking on the occupants of the Kia. Roman was arrested in a nearby neighborhood shortly thereafter.

Before Ruslan was arrested, startled residents in a nearby home discovered him in their home, drinking a glass of water. Ruslan left the house after a resident threatened to get his gun. At a different home, a resident discovered Ruslan trying to pry open her sliding glass door. She yelled to her boyfriend to "grab the gun." A Sheriff's K9 unit soon found Ruslan in the backyard.

Both juries heard that when he briefly talked to the police after his arrest, Ruslan claimed he had been driving both vehicles. Ruslan's jury heard statements he made to medical staff which were overheard by an officer. When asked by medical staff if he had hit the steering wheel, Ruslan replied, "Yeah I think so." He also said he had been involved in two accidents — one at 70 miles per hour and another one at 90 miles per hour.[8]

Roman also gave statements to the police after his arrest. He denied going to Auburn to steal from cars, claiming they went there in the early morning hours because they had "nothing to do" and Auburn was a "pretty cool place." He said it was his idea to go to Auburn. Later, he said they had gone there to steal from cars. But he claimed they had only tried to get into a couple of cars and did not get inside. He also, claimed at first that Ruslan was driving the BMW when they crashed. But later, he admitted he crashed the BMW. He denied going into houses to get keys and claimed the keys were in the truck when they took it. But he said he could not remember where the keys were within the truck. He said Ruslan was driving the truck when it crashed and he was in the backseat. Roman had said earlier that he had a warrant for failing to go to court. When

---

[8] Ruslan apparently did not specify in which of the two accidents he had travelling at 70 and 90 miles per hour.

asked whether they were trying to get away from law enforcement during the evasion in the truck, Roman said, "Not from the cops. I just wanted to, not from cops in general. *I just, I didn't want to go to jail*." (Italics added.) We discuss additional statements Roman made in Discussion part V, *post*.

**Verdicts and Sentencing**

Ruslan's jury found him guilty of conspiracy to commit theft (Pen. Code, § 182; count 1)[9]; evading a peace officer with wanton disregard for safety (Veh. Code, § 2800.2; count 4); first degree burglary with a person present (§ 459; count 5); two counts of first degree felony murder, with findings of more than one murder in the first degree, and that the murder was committed during the commission of a burglary (§§ 187, 190.2, subd. (a)(3) & (a)(17); counts 6 & 7); and trespass (§ 602.5; count 8). Ruslan's jury deadlocked on one count of assault on a peace officer and acquitted him of another count of the same offense (counts 2 & 3).

Roman's jury found him guilty of conspiracy to commit theft (count 1); evading a peace officer with wanton disregard for safety (count 4) and two counts of second degree murder (counts 6 and 7). It found him not guilty of both counts of assault on a peace officer (counts 2 & 3) and deadlocked on the residential burglary count.

Ruslan was sentenced to two terms of life without the possibility of parole for murder, along with concurrent terms of four years (the middle term) for burglary, two years (the middle term) for conspiracy to commit theft, two years (the middle term) for evading a peace officer, and 180 days for trespass.

Roman was sentenced to two consecutive 15-year-to-life terms for second degree murder, along with concurrent terms of two years (the middle term) for conspiracy to commit theft, and two years (the middle term) for evading a peace officer.

---

[9] Undesignated statutory references are to the Penal Code.

# RUSLAN'S CONTENTIONS

## I.  Substantial Evidence — Burglary

Ruslan contends his conviction for burglary, and the resulting felony-murder convictions, must be reversed because insufficient evidence established either he or Roman entered the home from which the keys to the Ford F-150 were stolen.  We disagree.

### A.  Additional Background

A witness testified that the morning of the crash, the Ford F-150 was stolen from the front of his house.  It had been parked on the street.  At the time, the truck was new and had been provided by his employer as a company vehicle.

He testified that he habitually locked the truck before going inside his house. Asked on cross-examination if he ever left the truck unlocked, he explained, "Never, unless I was going back into the house for something and coming back out.  I locked my work truck."[10]

The night the truck was stolen, he left the keys on the kitchen island along with his cigarettes.  Before going to bed, he took a cigarette from the pack (leaving the pack on the counter) and smoked on the patio before going upstairs to bed.

In the morning, he came out of his bathroom to hear the truck's panic alarm.  He testified that, if pushed, the panic button on the key fob beeps the horn repeatedly. Looking out the window, he saw the truck pull away from the curb.  He dialed 911 and ran outside to see the truck turn into a dead end, only to come back, pursued by numerous police cars.

---

[10]  A defense investigator would later testify that the witness had told him, "he thought he had locked [the truck]."  The witness also told him that "he didn't worry about locking his vehicles," though, on cross-examination, the investigator agreed the witness was not referring to his work truck.  Rather, he told the investigator he always locked his work truck and said, " 'I never leave my keys to the work truck in my work truck.' "

He went back inside his house and discovered the keys and his cigarettes were missing from the kitchen island. He testified: "And I know they were there the night before because I had a cigarette before I went to bed."[11]

In his backyard, he saw muddy footprints he didn't recognize around the sliding glass door to the kitchen. The sliding glass door was locked. He also noticed the gate to his backyard, which is usually kept closed and latched, was open. The footprints by the sliding glass door appeared to head in the direction of the side garage door. And the side door to the garage, which is usually propped open only about four inches to let the cat in, was wide open. He could not recall if the door connecting the interior of the garage to the house interior was left unlocked that night.

## B. Analysis

Where the sufficiency of the evidence is challenged on appeal, we review the record in the light most favorable to the judgment to determine whether it discloses substantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) Substantial evidence is evidence that is "reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid*.) " ' "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." ' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*).) And in applying the substantial evidence test, courts " 'do not reweigh evidence or reevaluate a witness's credibility.' " (*Nelson,* at p. 210.)

---

[11] The cigarettes were Pall Malls. After the crash, three packs of Pall Mall cigarettes were found in the truck.

9

Ruslan maintains that because defendants had only been stealing from unlocked vehicles that night, it was reasonable to infer the truck was unlocked and they found the key was inside. But there was ample evidence for the jury to conclude otherwise. The witness testified the truck was locked and the key was in the kitchen next to his cigarettes, which he knew because he had smoked before going to bed. Both the keys and the cigarettes were missing the following morning. Also, the gate to the back yard and the door to the garage were wide open. Later, before his arrest, Ruslan entered a different home, where he was found drinking water, and after that, he tried to pry open the sliding glass door of another — evincing a common plan or scheme of entering residential homes that night.

To that evidence, Ruslan picks nits. He argues the common indicia of burglary are missing, such as a sign of forced entry. He avers the witness testified it was merely his custom to leave the keys on the counter, and that he only thought he locked the truck. The witness did not tell one officer that he heard the truck's horn go off. The sliding glass door was locked, and there was no evidence of forced entry. There were shoeprints that were not sufficiently distinguishable to permit a match. And no forensic evidence was found in the house.

At most, these circumstances merely reconcile with a contrary finding. More fundamentally, they amount to an attack on the witness's credibility, which we do not reevaluate on a substantial evidence challenge. We conclude the witness's testimony constitutes substantial evidence in support of the burglary conviction. This case is certainly not one where " ' " 'upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*Penunuri*, *supra*, 5 Cal.5th at p. 142.) Accordingly, we thus reject Ruslan's substantial evidence claim concerning the burglary.

## II. Substantial Evidence — Aiding and Abetting Reckless Evasion

Ruslan next contends insufficient evidence supported his conviction on count 4, aiding and abetting Roman's reckless evasion from pursuing officers in the BMW. He

10

argues no evidence exists that he did anything to aid and abet Roman's high-speed evasion.[12]

The People respond that Ruslan's actions before, during, and after the BMW crash establish that Ruslan promoted and encouraged Roman's evasion. The People specifically point to Ruslan putting his hands out the window when the police told him to show hands and argue that Ruslan may have been trying to distract the police. The People also argue that his intent to aid and abet is shown by Ruslan accompanying Roman to steal from unlocked cars; their fleeing police together; Ruslan's failure to leave the car during the chase; Ruslan continuing to flee the police with his brother after the BMW crashed; and Ruslan's later false claim that he had been driving the BMW. We agree there was substantial evidence to support the evasion charge.

In addition to the circumstances the People highlight, we note an additional circumstance of significance: After Roman crashed the BMW, not only did the two brothers flee together, but together they stole another vehicle and continued evading police — *this time with Ruslan driving*. From these circumstances showing Ruslan's intent to aid and abet his brother's evasion, a jury could reasonably conclude that when Ruslan raised his hands outside the BMW window just before it sped off, he did so as a ruse, in order to aid and abet Roman's flight from police.

This therefore constitutes substantial evidence of aiding and abetting. It certainly cannot be said that " ' " 'upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict' " (*Penunuri, supra*, 5 Cal.5th at p. 142.)

---

[12] As charged, count 4 could apply to Ruslan driving the Ford F-150, but in closing, the prosecutor made clear the prosecution's theory was based on aiding and abetting Roman's escape in the BMW: "So if you struggle with … Count Four, this commission of this reckless driving from Auburn to Loomis is lengthy. And you just have to be convinced beyond a reasonable doubt that somewhere in that, … Ruslan was encouraging his brother to keep going."

### III. Expert Testimony Regarding Regressed Brain Development in Youth

Ruslan next challenges the trial court's exclusion of scientific studies regarding regressed brain development in youth. We find any error to be harmless.

### A. Additional Background

Ruslan moved in limine to have a psychiatrist testify, arguing the testimony was relevant to whether he had acted with implied malice when he collided into the Kia. An Evidence Code section 402 hearing was held, at which the psychiatrist testified he had twice examined Ruslan. He found Ruslan "really didn't have a severe mental illness" and "he has been a rather healthy kid." But Ruslan became an addict when, following a car crash, he was prescribed "a large batch of opiates."

The psychiatrist also testified that adolescents are more likely to engage in risky and impulsive behavior. As to Ruslan, it was "definitely possible that Ruslan at 19, at the time of this offense, on a biological, on a social level was more immature than even perhaps we see him today." He also agreed that most young individuals who use drugs make bad decisions. On cross-examination, the expert agreed that anyone, "not grossly mentally ill," would know driving down a wet road at 90 miles per hour in commute traffic is a bad decision.

Following the hearing, the trial court summarized: "this is what I heard: [adolescents are] … likely to engage in risky and impulsive behavior… I didn't hear anything that wasn't common knowledge." The court added, the psychiatrist "clearly [said] that Ruslan does not have a mental health disorder, and that is the only defense. This is not any information that applies to a defense." The court denied the request to have the psychologist testify, but noted, "this information is all relevant on the issue of sentencing."

### B. Analysis

On appeal, Ruslan challenges the exclusion of the psychologist's testimony arguing the evidence was outside jurors' common knowledge and was relevant to

12

Ruslan's subjective awareness of the risk and whether he acted with conscious disregard for life at the time he collided into the Kia.

We agree the evidence was relevant and probative as to the element of implied malice, but conclude that any error was harmless for the simple reason that Ruslan was convicted of first degree murder on a felony-murder theory. There was no implied malice requirement for that conviction. (*People v. Howard* (2005) 34 Cal.4th 1129, 1135 [felony murder " 'eliminates the need for proof of malice in connection with a charge of murder' "]; *People v. Chun* (2009) 45 Cal.4th 1172, 1184 [" 'The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to life' "].) Thus, even assuming the exclusion of the testimony was error, it had no conceivable effect on the verdict and was harmless under any standard.

### IV. Jury Misconduct & Ruslan's Motion to Continue

Ruslan contends the trial court abused its discretion in denying his trial counsel's motion to continue the hearing on his new trial motion grounded on alleged jury misconduct. We are unable to find an abuse of discretion.

### A. Additional Background

#### 1. Ruslan's Motions for a New Trial

On December 6, 2016, Ruslan's jury reached verdicts. The verdicts were read and recorded on December 8, 2016. Sentencing was set for January 20, 2017.

On December 12, 2016, counsel for Ruslan received an unsolicited phone call from the jury foreperson, who expressed concern about the deliberations. On December 16, 2017, counsel and his investigator met with the foreperson and obtained a declaration from her.

On January 13, 2017, Ruslan filed a motion for new trial. The motion averred that during the morning of December 8, 2016, after the jury had been reassembled in the deliberation room, prior to the reading of the verdicts, some jurors read about the case on

13

the Internet.[13]  The subject juror stated she did not look at the Internet, but stated:  "I have an excellent memory and I remember all the facts from the time that it happened."

In his declaration, counsel averred that during jury selection, all prospective jurors were asked if they had any prior knowledge about the case, and the subject juror "failed to disclose her detailed knowledge of the [d]efendants."

In support of the motion was the declaration signed by the jury foreperson.  In pertinent part the declaration stated:

"2.  On Tuesday, December 6, 2016 at approximately 4:00 P.M., the jury reached verdicts on all but one of the eight counts alleged against Ruslan Glukhoy.[[14]]

"3.  The jury reassembled at 8:30 A.M. on Thursday, December 8, 2016.  During that time, we discussed the case amongst ourselves.

"4.  At least six (6) of my fellow jurors began discussing facts about the case that were not introduced as evidence at trial; e.g., that the brothers were drug addicts, that they both had warrants out for their arrests, and that [the daughter of a deputy who testified] was killed."

"5.  Through further discussion, I was able to determine that these facts were learned by Internet searches after the verdicts were reached on Tuesday afternoon.  [¶] . . . [¶]

"7.  On each occasion that a comment was made, [the subject juror] would offer additional information.

---

[13]  Later, at the hearing on the new trial motion, counsel for Ruslan conceded "whatever [the jurors] learned on the Internet didn't have anything to do with their verdict."

[14]  The jury deadlocked on count 2, assault on a peace officer.

"8.  When I asked [the subject juror] if she had gone on the Internet, she denied going online.  She simply stated that, 'I have an excellent memory and I remember all of the facts from the time that it happened.' "

The foreperson went on to describe the subject juror as "loud, boisterous and a bully," and opined that "she would have voted guilty on all counts the moment we began deliberations."  The foreperson also declared, "I believe that [the subject juror] came into the deliberations with knowledge that prevented her from deliberating fairly."[15]

### 2.  Continuance Motion

On January 18, 2017, counsel for Ruslan filed a written motion to continue the January 20 sentencing on two grounds:  (1) Code of Civil Procedure notice requirements for his new trial motion were incompatible with the scheduled sentencing date, and (2) he planned to call a child forensic psychiatrist who was not available on the sentencing date.  Counsel did not assert in his written motion that he needed additional time to investigate the new trial motion.

The prosecutor, who had received the continuance motion the day before, filed an opposition, questioning the relevance of the psychiatrist's testimony given the court's lack of sentencing choices.  He also noted the psychiatrist's pretrial evaluation of Ruslan was "covered in the probation report filed in this case."  The prosecutor added he was unaware of any Code of Civil Procedure provision governing the proceedings,[16] but offered to waive any notice requirement and indicated the prosecution would be ready to proceed on the new trial motion.

---

[15] Nowhere in the declaration did the foreperson allege the subject juror mentioned to the jurors extraneous information concerning drug addiction and warrants during deliberations.

[16] We too are unaware of any Code of Civil Procedure provisions governing new trial motions in criminal cases.

Later that day, the trial court held a hearing on defendant's continuance motion. Defense counsel led off with the issue concerning the psychiatrist. He stated his testimony could be important if there were potential future changes in the youthful offender parole law,[17] but he could not secure the psychiatrist's presence on January 20. Regarding the new trial motion, counsel stated his investigator had been "working on it," but that "he's had some problems, personal problems and holidays and all that other stuff. It hasn't been a normal month since the verdict came in. And *we didn't rush this thing to January 20th*." (Italics added.) Counsel added that he also needed the two days to which he was entitled to respond to the prosecution's opposition to the new trial motion.

The trial court denied the motion to continue based on the psychiatrist's schedule, noting the court lacked sentencing discretion as to Ruslan, and there was no point to continuing the matter to make a record on the chance the parole law changed in the future.[18] While the court noted that counsel would have had his two days to respond to the prosecution's new trial motion opposition by the day of sentencing, it reserved decision as to the continuance of the hearing. The court indicated it was still reviewing the motion and doing its own research and may or may not determine there is a "need to have any additional testimony, hearings, et cetera on that motion." The court noted it could "elect to have testimony. Although, . . . I would say that's rare. It has to be based on affidavits." The court expressed skepticism about the foreperson's declaration, noting that she never reported any concerns to the bailiff or the court before or after the verdicts. The court indicated it had just begun its review and acknowledged there may be a basis to

---

[17] Ruslan, who was 19 years old when he committed the murders and sentenced to life without the possibility of parole, was not eligible for youthful offender parole. (§ 3051, subdivision (b)(4).)

[18] The court also stated it would make the psychiatrist's report part of the record on the sentencing.

16

continue the new trial motion, but further noted that it may be able to rule on the motion on January 20.

Counsel told the court: "It's possible that I will have additional information. And I stress the word possible. It is possible that I will have additional information for the Court on Friday that I do not have at the present time." Counsel never mentioned the possibility of needing a continuance to obtain additional information or to secure the presence of a witness at the new trial motion hearing.

### 3. New Trial Motion and Sentencing Hearing

At the beginning of the hearing on January 20, 2017, the court announced it would first consider the motions for a new trial and for a continuance. The court also noted that numerous jurors were present, but that the court had ordered them to stay outside the courtroom for the motion.

Ruslan's counsel argued the subject juror's failure to disclose that she knew Ruslan was a drug addict and had a warrant was misconduct because she was under oath and failed to mention that during voir dire. Counsel argued that the juror's failure to disclose prevented him from refuting or mitigating what the juror believed to be true. He added he would have challenged the subject juror for cause or exercised a peremptory challenge he had available to him.

The prosecutor responded that nowhere in the declaration did it state the subject juror learned of Ruslan's addiction and warrant prior to trial. It simply said she provided "additional information." The prosecutor maintained that once all inadmissible information from the declaration is excised, it shows neither misconduct, nor prejudice.[19]

---

[19] The prosecution also asserted there was evidence at trial that numerous syringes were found in the glove box of the BMW, and the jury would have become aware the brothers were drug users based on this evidence. Our review of the record reveals that the trial evidence did indeed establish that among the items recovered from the BMW were a

17

Ruslan's counsel responded that the declaration stated that jurors began discussing the brothers' drug addictions and warrants, and "[o]n each occasion that a comment was made [the subject juror] would offer additional information," citing her "excellent memory." Counsel went on, "[i]f it's not abundantly clear to the Court that they were talking about drug addiction and the warrants, then I failed in preparing this declaration." He added that the foreperson was outside and willing to testify that the subject juror had specifically talked about Ruslan's drug addiction and warrants.

The court replied that it had reviewed the foreperson's affidavit. It then struck portions of the affidavit as "purporting to describe the mental process of other jurors."[20] Reviewing the balance of the affidavit, the court explained: "The foreperson's declaration indicates that at least six jurors were discussing information — and I have " 'information' " in quotes because I'm using her language — that both the Defendants were drug addicts, they both had warrants, and that [the deputy's] daughter had died. [¶] The declaration also indicates that [the subject juror] added additional information, but there is no specifics as to what additional information was received."

To counsel, the court said, "I see you're upset, but I want you to know the Court is required to rely on the declaration." Ruslan's counsel interjected that he could amend the declaration. "I appreciate that," the court returned, "but this is my time to rule," adding, "I understand your argument, I don't think it would change this ruling."

---

glass jar containing marijuana and a marijuana grinder, as well as several syringes, one of which contained what was thought to be heroin.

[20] It struck Paragraphs 9 through 13. Paragraphs 9 and 10 referred to the juror in question as a bully, that she would have voted guilty on all counts the moment deliberations began, and that she convinced other jurors on the burglary count. Paragraph 11 stated. "I believe that [the juror in question] came into the deliberations with knowledge that prevented her from deliberating fairly." Paragraphs 12 and 13 pertained to another juror who, among other things, stated she was "afraid we are going to let him off with a slap on the wrist."

The court continued, "I have to follow the law, and the law strictly requires that I base my decision solely on what's in the declaration."[21] "The declaration … is not specific about what information [the subject juror] purportedly had and what she purportedly used." The court went on to say, "when we look at a motion for a new trial, the Court must try to preserve the jury verdict if it's legally possible."[22]

The court then denied the motion for a new trial, explaining, "I gave very serious review to counsel's contentions … but … there's no evidence other than pure speculation on behalf of [the foreperson], that this juror … was biased against the Defendant or had any specific information and that that information was inherently prejudicial to the Defendant."

Ruslan's counsel asked for a "reasonable continuance" to amend the declaration to provide additional information. He then noted they had "recently" found the location of the subject juror and his investigator was supposed to talk to her the previous weekend, but a family emergency had prevented that. Counsel did not say exactly when they located the juror, what efforts had been made to locate her, and why the investigator or another had not attempted to talk to the juror earlier in the week before the January 20 sentencing and new trial hearing, which was on a Friday.[23]

The court denied the continuance noting, "There are other procedural remedies that you can follow should there be new and different information." It added: "This is a

---

[21] As we discuss *post*, in a criminal trial, a court must hold a hearing under certain circumstances.

[22] We are not sure what the trial court meant here, and defendant did not ask for clarification. We would agree, however, that a trial court may not grant a new trial motion in the absence of evidence warranting a new trial.

[23] We take judicial notice that January 20, 2017, was a Friday. (Evid. Code §§ 452, subd. (h), 459 subd. (a)(2); *Douglas v. Janis* (1974) 43 Cal.App.3d 931, 936.)

19

case that is a very serious matter, and the victims are entitled to closure and to move forward. And there is no basis to continue beyond that."

Sentencing thereupon commenced.

### B. Analysis

On appeal, Ruslan contends the trial court abused its discretion in denying his motion to continue. Citing *People v. Hayes* (1999) 21 Cal.4th 1211, 1255 (*Hayes*), he argues that a trial court, once aware of possible juror misconduct, " 'must "make whatever inquiry is reasonably necessary" ' to resolve the matter," and he maintains that if such a serious allegation came down to a question of semantics, it was incumbent on the trial court to allow clarification of the foreperson's allegation. He adds that, " ' "[a] juror who conceals relevant facts or gives false answers during the voir dire examination . . . undermines the jury selection process and commits misconduct," ' " citing *In re Hitchings* (1993) 6 Cal.4th 97, 111.

The People respond that denying the continuance was within the trial court's discretion, arguing the court carefully analyzed Ruslan's reasons for a continuance and found them deficient. Further, Ruslan's counsel had over five weeks to prepare an adequate new trial motion, and the trial court did nothing to prohibit him from investigating the asserted misconduct. We agree with the People.

As to allowing a clarification of the foreperson's declaration, "[w]hen a trial court is aware of *possible* juror misconduct, the court 'must "make whatever inquiry is reasonably necessary' " to resolve the matter. [Citation.] It must do so, however, *only when the defense comes forward with evidence* that demonstrates a 'strong possibility' of prejudicial misconduct. [¶] *Normally, hearsay is not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct*." (*Hayes, supra*, 21 Cal.4th at pp. 1255-1256, second italics added; see also *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 517 (*Mora and Rangel*) [the obligation to investigate is triggered "only when the defense provides evidence strongly suggestive of prejudicial misconduct" and

"we acknowledged in *Hayes* and have reiterated many times, hearsay is ordinarily 'not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct' "].)

Citing *People v. Hedgecock* (1990) 51 Cal.3d 395, which authorizes evidentiary hearings for new trial motions in criminal cases, Ruslan asserts that at a minimum, the jury foreperson should have been allowed to testify and clarify any vagueness in the declaration. He further asserts: "The jury foreperson was already at the courthouse and could have testified — but if not, an amended declaration would have taken very little time." But as our high court has also stated: "ordinarily a trial court does not abuse its discretion in declining to conduct an evidentiary hearing on the issue of juror misconduct when the evidence proffered in support constitutes hearsay." (*People v. Dykes* (2009) 46 Cal.4th 731, 810; see also *Mora and Rangel*, *supra*, 5 Cal.5th at p. 517 ["Hearsay evidence offered in support of a new trial motion that is based on alleged jury misconduct ordinarily is insufficient to establish an abuse of discretion in either denying the motion *or declining to conduct an evidentiary hearing*' "].) (Italics added.)[24] Indeed, neither an

---

[24] While the court in *Hedgecock* authorized evidentiary hearings in new trial motions grounded on jury misconduct in criminal cases, the court was clear about the circumstances when a trial court must hold evidentiary hearing. "[W]hen a new trial motion in a criminal case is based on allegations of juror misconduct, the trial court may conduct an evidentiary hearing to determine the truth of the allegations." (*Hedgecock*, *supra*, 51 Cal.3d at p. 415.) But "[a] defendant is not entitled to such a hearing as a matter of right," and "an evidentiary hearing need not be conducted in every instance of alleged juror misconduct." (*Id*. at pp. 415, 419.) "The hearing should not be used as a 'fishing expedition' to search for possible misconduct, but should be held only when the defense has come forward with *evidence* demonstrating a strong possibility that prejudicial misconduct has occurred." (*Id*. at p. 419, italics added.) But "[e]ven upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' *evidence presents a material conflict* that can only be resolved at such a hearing." (*Ibid*., italics added.) Again, the predicate is admissible evidence and since there was no admissible evidence before the court, there was no conflict in any evidence for the court to resolve.

amended declaration, nor the foreperson's testimony would have fixed the hearsay problem here. The foreperson could only testify about the subject juror's purported statement that defendant sought to admit for the truth of the matter asserted as to the timing of when she purportedly received certain information; he offers the statement to prove that the subject juror had been exposed to information about the brothers' warrants and drug addiction before voir dire.

Defendant has offered no reason to deviate from the usual rule that "[n]ormally, hearsay is not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct" (*Hayes, supra,* 21 Cal.4th at p. 1256) and "ordinarily a trial court does not abuse its discretion in declining to conduct an evidentiary hearing on the issue of juror misconduct when the evidence proffered in support constitutes hearsay." (*Dykes, supra*, 46 Cal.4th at p. 810.)[25] Thus, under these circumstances we cannot find an abuse of discretion. We realize the trial court's ruling was not based on the purported statement of the subject juror being hearsay, but conclude we cannot find the court abused its discretion when it would have been an abuse of discretion to consider inadmissible evidence in granting an evidentiary hearing or to consider it in deciding the new trial motion.

As for the continuance motion, a continuance in a criminal matter may only be granted for good cause. (§ 1050, subd. (e)); *People v. D'Arcy* (2010) 48 Cal.4th 257, 287 (*D'Arcy*.) We review the denial of such motions for abuse of discretion. (*D'Arcy,* at p. 287.) " ' "There are no mechanical tests for deciding when a denial of a continuance is

_____

[25] For example, if the subject juror refused to talk to investigators or provide a declaration, such a circumstance might warrant deviation from the general rule and conduct a hearing. And, if the subject juror had provided a statement or declaration in which she denied making the statement attributed to her by the foreperson, the foreperson's declaration would be admissible for the truth of the matter as a prior inconsistent statement.

so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." ' " (*Id*. at pp. 287-288.) Also, a showing of good cause requires a demonstration of diligence. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 (*Jenkins*).)

Here, the record does not demonstrate due diligence in investigating the new trial motion. Indeed, the original continuance motion was not grounded on the need for time to obtain additional information. And at the initial hearing on the continuance motion, counsel did not mention a need for that purpose. As the Attorney General points out, defendant had over five weeks to investigate his jury misconduct claim. The record does not show that the defense moved to obtain juror contact information under Code of Civil Procedure section 237. Counsel stated the defense had "recently" located the subject juror, but no date or other elaboration was offered.[26] Nor did counsel explain what efforts had been made after he met with the foreperson on December 16, 2016. Counsel did admit that in part, because of the holidays, they "didn't rush this thing to January 20th." He mentioned a plan to obtain a declaration from the subject juror the previous weekend, but his investigator had a pressing family matter. That is understandable, but no explanation was given as to why no attempts had been made before that weekend or in the week leading up to the Friday, January 20, 2017, hearing.

Because diligence must be shown to establish good cause, we conclude that under these circumstances, the trial court did not abuse its discretion in denying the continuance.[27] (See *Jenkins*, *supra*, 22 Cal.4th at p. 1037.) Indeed, orders denying

---

[26] We note the juror listed her place of employment on her jury questionnaire.

[27] Ruslan also asserts in his opening brief that he is entitled to a new trial under section 1202. In pertinent part, section 1202 provides: "If the court shall refuse to hear a defendant's motion for a new trial or when made shall neglect to determine such motion before pronouncing judgment or the making of an order granting probation, then the defendant shall be entitled to a new trial." The contention is meritless. As the Attorney

continuances are seldom successfully attacked on appeal, as such discretion is abused "only when the court exceeds the bounds of reason, all circumstances being considered." (*People v. Beames* (2007) 40 Cal.4th 907, 920.)  And as the trial court noted, there are other procedural remedies available to defendant if he was able to secure the information he sought.

**ROMAN'S CONTENTIONS**

**V.  Counsel's Concession of Conspiracy and Evading Counts**

Roman contends the convictions for evading a peace officer with wanton disregard for safety and conspiracy to commit theft must be reversed because his trial counsel conceded those counts during closing arguments.  In support he cites *McCoy v. Louisiana* (2018) 138 S.Ct. 1500, 1505 (*McCoy*), which held that "a defendant has the right to insist that counsel refrain from admitting guilt," as well as *People v. Farwell* (2018) 5 Cal.5th 295, 308 (*Farwell*), which held a stipulation admitting all elements of an offense requires a constitutionally valid waiver of trial rights.  We find no error.

**A.  Additional Background**

As noted, Roman eventually confessed to attempting to steal from cars in Auburn.

Roman's counsel began his closing argument by telling the jury, "the basic facts are fairly straightforward, with two notable exceptions:  Where were the keys to [the] truck and did Roman do anything to aid and abet his brother during his brother's evading."  Thereafter, he focused his argument on these two issues and the alleged assault on the two Rocklin officers.

Later, Roman's counsel pointed to verdict form for the conspiracy count and told the jury, "That's the box where you will write 'guilty,' ….  It has never been an issue in this case."  He added, "We have never contested that Roman and [the friend] and Ruslan

---

General points out, the record plainly establishes that the trial court heard and denied defendant's new trial motion.  And Ruslan did not attempt to rebut this argument in his reply brief.

24

went to Auburn to take stuff out of people's cars." He added regarding the verdict, "It will be a simple one. You can find him guilty of that count."

As to the evading count, he told the jury, "you're going to find him guilty of this count and you should. He did damage to property, he violated more than three laws, he was driving in excess of the speed limit, and it was a long pursuit."

## B. Analysis

On appeal, defendant argues that, like in *Farwell*, his counsel's concession of these counts was tantamount to a guilty plea, as it admitted the elements of the offense, relieving the prosecution of its burden of proof. Thus, it required a knowing and informed waiver of his right to a jury trial on those counts. He is mistaken.

In *Farwell*, trial counsel stipulated to every element of an offense, and the trial court instructed the jury to accept the stipulation as true. (*Farwell*, *supra*, 5 Cal.5th at pp. 298-299.) Our high court concluded that the "stipulation conclusively established the stipulated facts as true and completely relieved the prosecution of its burden of proof on" the stipulated count. (*Id*. at p. 300.) It reasoned that "[a] stipulation that admits all of the elements of a charged crime necessary for a conviction is tantamount to a guilty plea." (*Id*. at p. 299.) "By entering the stipulation, Farwell effectively surrendered his privilege against self-incrimination, his right to confrontation, and his right to a jury trial on count 2." (*Id*. at p. 300.)

Here, however, no such stipulation was entered, nor was the jury instructed to find each element established. Instead, the jury was expressly instructed that the prosecution must prove the elements of the conspiracy and evading crimes. And, as Roman concedes on appeal, unlike a stipulation, concessions still require the prosecution to prove, and the jury to find, the charges true beyond a reasonable doubt. (See *Florida v. Nixon* (2004) 543 U.S. 175, 188 [160 L.Ed.2d 565] (*Nixon*) ["Despite [trial counsel's] concession, Nixon retained the rights accorded a defendant in a criminal trial"].)

25

Roman, however, argues that a concession, like a stipulation, is the functional equivalent of a plea. He maintains that *People v. Lopez* (2019) 31 Cal.App.5th 55 (*Lopez*), which held otherwise, was wrongly decided. He reasons that when counsel tells a jury to convict, it for all intents and purposes relieves the prosecution from proving its case beyond a reasonable doubt. We disagree.

Counsel's concession was consistent with Roman's unchallenged confession in which he admitted to going to Auburn to burglarize cars and driving the BMW when it crashed during the first pursuit.[28] And just as a pretrial confession is not the functional equivalent of a plea, neither is a strategic concession by counsel. Thus, we join another panel of this court and several other courts in concluding a concession is not tantamount to a guilty plea. (*People v. Franks* (2019) 35 Cal.App.5th 883, 891 (*Franks*); See also *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1165-1167; *People v. Burns* (2019) 38 Cal.App.5th 776, 784, review granted Oct. 30. 2019, S257738, review dismissed July 29, 2020; *Lopez*, *supra*, 31 Cal.App.5th at p. 64 [distinguishing *Farwell* and concluding concession did not relieve the prosecutions' burden]; See also, *People v. Cain* (1995) 10 Cal.4th 1, 30 ["trial counsel's decision not to contest, and even expressly to concede,

_____

[28] We also note that the concession on the evading charge was consistent with counsel's defense on behalf of his client on the two counts of assault on a peace officer. As to those counts, in discussing the encounter in the cul-de-sac, Roman's counsel argued to the jury that a reasonable inference based on the evidence could be drawn that Roman was trying to get away, there was no way to do so other than by driving in the direction of the officers and ultimately Roman drove the car around the officers "far away" from where their vehicles were. Counsel argued, "this was an escape, this was not an assault." Counsel further argued since the inference that Roman was simply trying to escape was a reasonable interpretation of the circumstantial evidence, the jury was duty bound to find Roman not guilty of that charge. The concession that Roman was guilty of evading flowed naturally from this argument and added credibility to his defense of the assault on a peace officer counts. Regarding the verdict forms on the assault counts, defense counsel told the jury, "you're going to write 'not guilty' because if you follow the circumstantial evidence test, it's the only conclusion you can come up with. And that is what the jury did; Roman was found not guilty on those two counts.

26

guilt on one or more charges at the guilt phase of a capital trial is not tantamount to a guilty plea requiring a *Boykin–Tahl* waiver"].)

Roman also argues, citing *McCoy*, that the record must affirmatively show his waiver was voluntary and intelligent because otherwise, the record fails to evince that he knew of his counsel's decision to concede guilt. Roman is mistaken. The Court in *McCoy* held that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." (*McCoy, supra*, 138 S.Ct. at p. 1505.) But, the Court further explained, if a defendant remains silent, neither approving nor protesting a concession strategy, no such requirement exists. (*Id*. at pp. 1505, 1509 distinguishing *Nixon, supra*, 543 U.S. 175.) Thus, "*McCoy* makes clear . . . that for a Sixth Amendment violation to lie, a defendant must make his intention to maintain innocence clear to *his counsel*, and counsel must override that objective by conceding guilt." (*Franks*, *supra*, 35 Cal.App.5th at p. 891.) Because the record here contains no express objection by Roman, *McCoy* is inapplicable.

The contention therefore fails.

## VI. Natural and Probable Consequences Instruction

Roman contends the trial court erred in failing to instruct sua sponte that under a natural and probable consequences theory, an aider and abettor can be guilty of a lesser non-target offense than the perpetrator. He acknowledges the jury was instructed that an aider and abettor may be found guilty of a different crime than the perpetrator if their mental states differ, but he maintains "the instruction was wholly inadequate because it lacked any reference to the natural and probable consequences doctrine . . . ." He alternatively argues his trial counsel rendered ineffective assistance in failing to request the instruction.

We discuss the invalidation of the natural and probable consequences doctrine by Senate Bill 1437 *post*. We must nevertheless address this issue because if Roman is

right, his murder convictions would be reversed on this ground. However, we find no error.

## A. Additional Background

Before closing arguments, the parties and the trial court discussed jury instructions, off the record. Back on the record, Roman's counsel asked to modify CALCRIM No. 400 to state, "that an aider and abettor may be guilty of different crimes and different degrees of crimes where they do not have the same mental state." He contended that "if [the jury is] not advised that … an aider and abettor can have a different crime or different degree, [the jury] may erroneously conclude, if they believe that Ruslan's act of driving was in conscious disregard for human life, that they're required to find that Roman had the same mental state or is guilty of the same degree because that's not addressed in the [CALCRIM No.] 400 instruction . . . ."

The prosecutor responded that the concept was adequately contained in CALCRIM Nos. 401[29] and 403, and including it in CALCRIM No. 400 would add confusion.

The trial court ultimately instructed the jury, *as requested by defendant*, with a modified CALCRIM No. 400. In part, it instructed: "A person may be guilty of a crime in two ways: One, he may have directly committed the crime. I will call that person the perpetrator. Two, he may have aided and abetted a perpetrator who directly committed the crime."

---

[29] CALCRIM No. 401 instructs: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: 1. The perpetrator committed the crime; 2. The defendant knew that the perpetrator intended to commit the crime; 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

The modified CALCRIM No. 400 went on to instruct: "Under some circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime. *An aider and abettor may be found guilty of a different crime or degree of crime than the perpetrator if the aider and abettor and the perpetrator do not have the same mental state*." (Italics added.)

As to aiding and abetting second degree murder based on the natural and probable consequences doctrine, the court instructed using CALCRIM No. 403, in pertinent part: "To prove that the defendant is guilty of second-degree murder, the People must prove that, [1.] the defendant is guilty of willful evading a peace officer with a wanton disregard … *as an aider and abettor*; [2.], that during the commission of the willful evading a peace officer with wanton disregard, a co-participant in that willful evading with wanton disregard committed the crime of second-degree murder; and [3.], under all the circumstances, *a reasonable person in the defendant's position would have known that the commission of a second-degree murder was a natural and probable consequence* of the commission of willful evading a peace officer with wanton disregard." (Italics added.)

And as to gross and negligent vehicular manslaughter the court gave a similar CALCRIM No. 403 instruction: "To prove that the defendant is guilty of gross vehicular manslaughter or negligent vehicular manslaughter, the People must prove, one, the defendant is guilty of evading a peace officer with wanton disregard; [two] during the commission of evading a peace officer with wanton disregard, a co-participant in that offense committed the crimes of [gross][30] vehicular manslaughter or negligent vehicular manslaughter; and three, under all of the circumstances *a reasonable person in*

---

[30] In reading the instructions to the jury, the court omitted the word "gross," but it was included in the written version of the instructions provided to the jury.

*the defendant's position would have known that the commission of gross vehicular manslaughter or negligent vehicular manslaughter was a natural and probable consequence* of the commission of evading a peace officer with wanton disregard." (Italics added.)

## B. Analysis

On appeal, Roman argues the instructions were erroneous because they failed to inform the jury that an aider and abettor under a natural and probable consequences theory can be guilty of a lesser crime than the perpetrator. He maintains that as instructed, his jury would believe Roman could only be found guilty of a lesser offense if Ruslan also committed that lesser offense. We disagree.

A trial court must instruct sua sponte on the " ' "general legal principles raised by the evidence and necessary for the jury's understanding of the case…." ' " (*People v. Delgado* (2013) 56 Cal.4th 480, 488.) And on appeal, when we determine a jury instruction's sufficiency, we consider the "entire charge of the court." (*People v. Mills* (1991) 1 Cal.App.4th 898, 918.) We also presume "jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*Ibid.*)

Here, read together, the instructions informed Roman's jury that an aider and abettor, under a natural and probable consequences theory, could have different culpability than the perpetrator. The jury was instructed, using CALCRIM No. 403, that Roman could be convicted, as an aider and abettor under a natural and probable consequences theory, of either second degree murder or the lesser offenses, gross or negligent vehicular manslaughter. The jury was also instructed, using the modified CALCRIM No. 400, that an aider and abettor need not have the same criminal culpability as the perpetrator. Considered together, we do not think the jury would have understood the several instructions as carving out an exception for aiders and abettors convicted under a natural and probable consequences theory. Instead, we conclude a reasonable jury would have understood the modified CALCRIM No. 400 to mean what it said: "An

30

aider and abettor may be found guilty of a different crime or degree of crime than the perpetrator if the aider and abettor and the perpetrator do not have the same mental state."

Roman's fallback contention that his trial counsel rendered ineffective assistance in failing to request the instruction he now argues was necessary also fails. Again, a reasonable jury would understand the instruction that an aider and abettor can have different liability does not except aiders and abettors found guilty under a natural and probable consequences theory. Accordingly, no prejudice can stem from the failure to request a more explicit instruction. To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 104 [178 L.Ed.2d 624].) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland v. Washington* (1984) 466 U.S. 668, 693-694 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) The likelihood of a different result must be substantial, not just conceivable. (*Richter*, at p. 112.)

We conclude, based on the modified CALCRIM No. 400, that defendant has not shown *Strickland* prejudice as to this assignment of error. We also conclude *post*, that the evidence of defendant having the requisite mental state for implied malice murder was overwhelming, and for this separate reason, defendant was not prejudiced by the asserted error he assigns here.

## VII. Senate Bills 1437 and 775

Roman originally contended that his convictions for second degree murder must be reversed because Senate Bill No. 1437, enacted after his conviction, abrogated the natural and probable consequences doctrine as it relates to murder. He argued that Senate Bill 1437's amendments should be applied retroactively to him. Subsequently, our high

31

court spoke on the issue, holding that while Senate Bill 1437 barred a conviction for second degree murder under the natural and probable consequences doctrine, "the procedure set forth in section 1170.95 [was] the exclusive mechanism for retroactive relief and thus the ameliorative provisions of Senate Bill 1437 do not apply to nonfinal judgments on direct appeal." (*People v. Gentile* (2020) 10 Cal.5th 830, 839.) Thereafter, the Legislature enacted Senate Bill 775, amending section 1170.95 to add subdivision (g), which provides that a defendant whose conviction is not final may "challenge on direct appeal the validity of [a murder] conviction based on" the Senate Bill 1437 amendments. Both sides now agree that defendant is entitled to challenge his second degree murder convictions based on Senate Bill 775. They disagree, however, as to the outcome of that challenge.

While Roman argues we must reverse the murder convictions and vacate the sentence based on the Legislature's invalidation of the natural and probable consequences doctrine, the Attorney General argues the alternative-theory instructional error brought about by the retroactive application of Senate Bill 1437 is harmless. We asked the parties to address at oral argument whether, in light of this court's decision in *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*), Roman's jury received an erroneous instruction on aiding and abetting second degree murder. Roman argued that, based on *Powell*, there was prejudicial instructional error as to direct aiding and abetting implied malice murder. The Attorney General did not contest this assertion.

As we shall discuss, we conclude both errors are harmless beyond a reasonable doubt. We begin by detailing additional facts.

### A. Additional Background

### 1. The First Crash, Theft of the Truck and Flight on Interstate 80

Investigators began their interview of Roman by asking what had happened that morning. Roman initially responded, "It's just a stupid choice," adding that when the police tried to stop him in Auburn, "I was stupid when I was running." He said he fled

because he had a warrant for not showing up to court. After the BMW crash, he and his brother fled on foot together, jumping some residential fences.

Roman claimed when they came upon the truck, they found it to be unlocked and hid in it for what seemed like 15 to 20 minutes. He got in the rear passenger seat behind the driver's seat where Ruslan sat. Scared by sirens they heard, they started the truck and drove off. When asked their intent in driving the truck away, Roman replied, "Uh, just a stupid choice."

Roman said he looked at the speedometer while fleeing from law enforcement on Interstate 80, and they reached a speed of 90 miles per hour, but he denied going faster. When asked if he remembered telling Ruslan to stop or slow down, Roman said, "I don't remember."

### 2. The Evasive Flight on Antelope Road and Fatal Collision

Roman told investigators that while they were on Interstate 80, Ruslan asked him where they should go. Roman told him to take the Antelope exit because they were familiar with the area. Roman said, after getting off on Antelope, "[w]e didn't know where to go from there."

The testimony from pursuing deputies established that while in the Interstate 80 rush hour traffic, the truck abruptly cut across the freeway lanes to exit at Antelope Road. Vehicles on the offramp were stopped for a red light at the Antelope Road intersection, and traffic there was, "very heavy," with, "a lot of commuter traffic." To get through this traffic, the truck "split" the two lanes of vehicles that had stopped and drove through the red light onto Antelope Road.

The roadway on Antelope Road was wet and heavily congested with traffic. The truck made multiple lane changes in this traffic. There were several major intersections on Antelope Road controlled by traffic lights with cross traffic. There was cross-traffic at almost all of the red lights they ran. When driving through the red lights, the truck took "the fastest path through" the intersections. For example, at one major intersection, to get

33

around traffic, the truck crossed into the left turn lane, went through the red light and then merged back into the traffic lane on Antelope Road on the opposite side of the intersection. One deputy testified it was more dangerous driving at high speeds on surface roads as opposed to the freeway because of intersections, potential pedestrians and bicyclists, especially at 6:30 a.m. on a weekday. He also testified that in his opinion it was luck that the truck did not collide into anybody at those major intersections before the fatal crash.

Pursuing deputies testified that the truck was travelling at speeds up to 80 or 90 miles per hour during the evasion on Antelope Road. And it was putting distance between the pursuing deputies, who, although traffic was moving to the side, had to slow down as they went through intersections.

The pursuit ended when Ruslan drove over an overpass at what deputies testified was 70 to 80 miles per hour, entered the next intersection against the red light and collided into the Kia as it was making a left turn from Antelope Road onto a side street. The primary pursuing deputy testified that as he was descending the overpass, he saw that the truck had collided into the Kia and watched it push the Kia approximately 45 yards.

One motorist, stopped next to the Kia at what was then a red light, observed the Kia drive forward into the intersection when the left turn signal turned green. The motorist then saw the truck come over the overpass in the opposite direction as she proceeded forward on her green light. Thereafter, she heard a crash and looked back to see the truck had collided with the Kia. She estimated the truck came over the overpass at 75 to 85 miles per hour, and described the speed of the truck as "like a bat out of hell." As she saw the truck crest the overpass before the collision, she thought it would flip or cause a collision because the roadway was wet.

Another motorist who started to follow the Kia into the intersection from the left turn lane saw the truck speeding toward them from the opposite direction in the right turn

34

lane, only to move into the center lane before entering the intersection and crashing into the Kia. He estimated the truck's speed as 70 to 75 miles per hour.

After the truck and Kia came to a stop, the primary pursuing deputy saw two occupants exit the truck's passenger and driver's side. The driver ran around the wreckage, past the vehicle he had struck. Responding to a question posed by a juror, the deputy testified that the driver did not check on the people in the Kia. The person who got out of the passenger side ran toward the sidewalk toward the person who got out of the driver's side and the two fled into the neighborhood, jumping fences to make their escape.

The posted speed limit on Antelope Road at the intersection where the collision occurred was 45 miles per hour. The traffic lights at the intersection are visible from 800 to 900 feet, just before cresting the overpass. The ambient lighting from sunrise and the artificial lighting in the area illuminated the intersection. Looking at historical crash data and other information for the intersection, an expert civil engineer determined there was nothing indicating the roadway was unsafe. There had been no prior fatalities at the intersection.

Accident reconstruction testimony established that the truck was traveling between 70 and 81 miles per hour at the point of impact.[31] But based on pre-collision data from

---

[31] Investigator Darrell Nishimi of the California Highway Patrol Multidisciplinary Accident Investigation Team (MAIT) testified as an accident reconstruction expert. Pre-collision information stored in the air bag control module of the truck recorded the truck's speed at 70 miles per hour at the point of impact. Nishimi opined, based on his calculations, that the speed was actually 81 miles per hour at impact. A defense investigator opined, based on his calculations, that at impact, the truck was traveling between 70 to 74 miles per hour. The defense expert also acknowledged that the truck was travelling faster on this surface street than the 65-mile-per-hour speed limit on Interstate 80. Additionally, he acknowledged that the Kia violated no traffic laws.

the truck's air bag control module, the truck was actually travelling at 93 miles per hour just one and a half seconds before the collision.[32]

## B. Aiding and Abetting Implied Malice Murder

## 1. Elements of Aiding and Abetting Implied Malice Murder

The elements of implied malice murder relative to the actual perpetrator are: "(1) [The perpetrator] intentionally committed an act; (2) the natural and probable consequences of that act were dangerous to human life; (3) At the time [the perpetrator] acted, [he/she] knew [his/her] act was dangerous to human life; and (4) [T]he perpetrator deliberately acted with conscious disregard for human life." (CALCRIM No. 502; *People v. Navarette* (2016) 4 Cal.App.5th 829, 843-844.)

In *Powell*, we held that aiding and abetting implied malice murder is a valid theory of liability for second degree murder. (*Powell*, *supra*, 63 Cal.App.5th at pp. 710-714; accord, *People v. Superior Court* (*Valenzuela*) (2022) 73 Cal.App.5th 485, 499 [agreeing with *Powell* that aiding and abetting implied malice murder is a valid theory of culpability for second degree murder]; see also *People v. Langi* (2022) 73 Cal.App.5th 972, 982, 983, 984, fns. 10 and 12 (*Langi*) [acknowledging *Powell* and *Gentile* and stating: "Current law thus provides that the actual killer, or a direct aider and abettor of the killing who knew that his (or her) conduct endangered the life of another and acted with conscious disregard for life, may be guilty of second degree murder"].)

In *Powell*, we explained the actus reus and mens rea elements of direct aiding and abetting implied malice.

The actus reus required of the actual perpetrator is the commission of "a life endangering act." (*Powell, supra*, 63 Cal.App.5th at p. 714.) By "life endangering act," we mean an act for which the natural and probable consequences are dangerous to human

---

[32] The defense accident reconstruction expert acknowledged that the 93 miles per hour speed recorded by the airbag control module was accurate.

life and proximately caused death.  (*Powell*, at pp. 713, fn. 27 and 714; see also *People v. Knoller* (2007) 41 Cal.4th 139, 143 [describing the required act as "an act, the natural consequences of which are dangerous to life" or stated slightly differently, "conduct that endangers the life of another"]; *People v. Watson* (1981) 30 Cal.3d 290, 296, 300 (*Watson*) [same].)

To be culpable as a direct aider and abettor of implied malice murder, the accomplice "must, by words or conduct, aid the commission of the life-endangering *act.*" (*Powell*, *supra*, 63 Cal.App.5th at p. 713.)  Thus, the aider and abettor's actus reus "includes whatever acts constitute aiding the commission of the life endangering act." (*Ibid.*; accord *Valenzuela*, *supra*, 73 Cal.App.5th at p. 501.)

"The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life."  (*Powell*, *supra*, 63 Cal.App.5th at p. 713; accord *Valenzuela*, *supra*, 73 Cal.App.5th at p. 501.)

## 2.  Validity of the Theory of Aiding and Abetting Implied Malice Murder

Acknowledging our decision in *Powell*, Roman nevertheless maintains that aiding and abetting implied malice murder is not a valid theory of liability for second degree murder and that *Powell* was wrongly decided.

Fundamentally, Roman criticizes our reliance in *Powell* on our high court's statement in *Gentile* that:  "notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life."  (*Powell*, *supra*, 63 Cal.App.5th at p. 713 and fn. 29, quoting *Gentile*, *supra*, 10 Cal.5th at p. 850, italics omitted.)  Roman asserts our high

court's statement in *Gentile* was dicta, and thus unnecessary to the resolution of the case.[33]

But while statements unnecessary to a court's decision are not binding precedent, it is well-settled that our high court's " 'dicta generally should be followed, particularly where the comments reflect the court's considered reasoning.' " (*People v. Tovar* (2017) 10 Cal.App.5th 750, 759, quoting *People v. Rios* (2013) 222 Cal.App.4th 542, 563; See also, *United Steelworkers of America v. Board of Education* (1984) 162 Cal.App.3d 823, 835 ["Even if properly characterized as dictum, statements of the Supreme Court should be considered persuasive"]; *City of Los Angeles v. San Pedro, L.A. & S.L.R. Co.* (1920) 182 Cal. 652, 660 ["The statements in the opinions of the Supreme Court of this state ... although *obiter dicta*, are very persuasive"].)  In our view, the *Gentile* court's observation, in effect, recognizing the validity of aiding and abetting implied malice murder, was reflective of "considered reasoning," and it was persuasive and should be followed.  (See also, *Valenzuela, supra,* 73 Cal.App.5th at p. 499 [also relying on the quotation from *Gentile* and concluding that *Powell* was "entirely consistent with *Gentile* in basing murder liability on the aider and abettor's own state of mind—*conscious* disregard for life"]; *Langi*, *supra*, 73 Cal.App.5th at p. 979 [also relying on the *Gentile* quote].)

Defendant also asserts that our focus on the life endangering act and making an aider and abettor liable for the result of that act regardless of his intent to achieve that result "simply repackaged [natural and probable consequences] murder as aiding and

---

[33]  As Roman notes the *Gentile* court's statement concerning direct aiding and abetting implied malice murder was made in response to an amicus brief which argued for a hybrid version of the natural and probable consequences doctrine to reach scenarios illustrated in two unpublished opinions.  (*Powell*, *supra*, 63 Cal.App.5th at p. 713, fn. 29, citing *Gentile*, *supra*, 10 Cal.5th at pp. 849-851.) According to Roman, because our high court was responding to an argument by amicus, the court's quote was unnecessary to the resolution of Gentile's appeal.

abetting implied malice murder." We disagree. As we noted in *Powell*, under the natural and probable consequences doctrine, the prosecution was not required to prove the mental state required for implied malice: the aider and abettor was subjectively aware of the risk of death and acted in conscious disregard thereof. On the other hand, the prosecution must prove those elements to establish direct aiding and abetting implied malice murder. (*Powell*, *supra*, 63 Cal.App.5th at pp. 711-713.) This distinction was recognized by the court in *Valenzuela* in rejecting an argument similar to the one Roman makes here. (*Valenzuela, supra,* 73 Cal.App.5th at pp. 503-504 [the natural and probable consequences doctrine the Legislature sought to eliminate in Senate Bill 1437 did not require a finding that the aider and abettor know his conduct endangers the life of another and that he acted with conscious disregard for life]; see also *People v. Soto* (2020) 51 Cal.App.5th 1043, 1056, 1059 [the natural and probable consequences for indirect aiding and abetting and the natural and probable consequences for implied malice murder "are distinctly different concepts," the latter of which pertains to the mental state the aider and abettor must share with the actual perpetrator and it "does not transform" an implied malice murder conviction into one for murder under the natural and probable consequences doctrine within the meaning of section 1170.95].)

Roman next argues that Senate Bill 1437 actually eliminated aiding and abetting liability for implied malice murder by amending section 188 to provide that malice may not be "imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a).) According to Roman, the theory of direct aiding and abetting implied malice we discussed in *Powell*, "indicates that malice is imputed to a person based *solely* on his or her participation in the crime." (Italics added.) Not so.

Again, for liability under the natural and probable consequences doctrine, the aider and abettor need only have the intent to participate in a target offense; guilt for the charged crime is thereby imputed to him. But for second degree murder based on implied malice, there is no imputation of malice because, as we have explained, the direct aider

39

and abettor must have the same mental state as the actual perpetrator of the charged crime:  the direct aider and abettor must act with knowledge that *the act* is dangerous to human life and with conscious disregard for human life.  Given the mens rea requirements for aiding and abetting implied malice, not only is malice not "imputed" on this direct aiding and abetting theory, but liability is not grounded "solely" upon participation in the crime within the meaning of section 188, subdivision (a)(3) as amended in Senate Bill 1437.  Liability for murder is grounded upon the requirement that the aider and abettor personally harbor malice.

We also note that there is no indication the Legislature intended to abrogate the concept of aiding and abetting implied malice murder as mentioned in *Gentile*.  In this regard, we think it significant that our high court's statement in *Gentile* concerning aiding and abetting implied malice was prefaced with:  "notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder. . . ."  The Legislative history of Senate Bill 775 indicates the Legislature's intent to abrogate the *Gentile* court's holding that the petition procedure in section 1170.95 was the sole method of challenging the validity of a conviction under Senate Bill 1437.[34]  But nothing in Senate Bill 775 or its legislative history indicates a rejection of our high court's observation concerning the availability of direct aiding and abetting implied malice murder as a theory of accomplice liability, nor is there any legislative history indicating disagreement with our holding in *Powell*.  If the Legislature intended to abrogate aiding

---

[34]  An Assembly Public Safety Committee analysis states:  "In *Gentile*, the California Supreme Court found that the petition process set forth in Penal Code section 1170.95 is the exclusive remedy for retroactive SB 1437 relief on nonfinal judgments.  [Citation.] Generally, the rule is that a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed.  [Citation.]  [¶]  This bill would provide that where a conviction is not final, it may be challenged on SB 1437 grounds on direct appeal from that conviction."  (Assem. Com. on Public Safety, Analysis of Senate Bill 775 as amended July 6, 2021, p. 11.)

and abetting implied malice murder, we think it would have expressly done so in Senate Bill 775. After all, when enacting legislation, " 'The Legislature is deemed to be aware of existing laws and judicial decisions . . . in effect at the time legislation is enacted, and to have enacted and amended statutes " '*in the light of such decisions as have a direct bearing upon them.*' " ' " (*People v. Castillolopez* (2016) 63 Cal.4th 322, 331, italics added; *People v. Licas* (2007) 41 Cal.4th 362, 367 (*Licas*); *People v. Overstreet* (1986) 42 Cal.3d 891, 897.)

We reject Roman's contention that direct aiding and abetting implied malice murder is not a valid theory of liability for second degree murder.

## C. *Powell* Instructional Error

Anticipating our rejection of the arguments immediately above, defendant argues that assuming aiding and abetting implied malice murder is a valid theory, the trial court's instructions were erroneous based on *Powell*. With this, we agree.

Like the instructions in *Powell*, the standard instructions given here were not tailored to address direct aiding and abetting liability for implied malice murder. (*Powell*, *supra*, 63 Cal.App.5th at p. 715; see also *Langi*, *supra*, 73 Cal.App.5th at p. 982 ["As explained in [*Powell*], the standard aiding-and-abetting instructions are ill suited to the crime of second degree murder," and if "a trial court uses such an instruction without tailoring it to the specifics of that crime, the instruction creates an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice"].)

Given this instructional error, we must determine whether the error was prejudicial. Before we do, we turn briefly to defendant's second claim of error — alternative-theory error — because the evolution of the legal analysis for harmless error has occurred most recently in the context of that form of instructional error.

41

### D. Retroactive Alternative-Theory Error

When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reviewing courts refer to this as alternative-theory error. (*People v. Aledamat* (2019) 8 Cal.5th 1, 9 (*Aledamat*).) Both sides agree the enactments of Senate Bill 1437 and 775 effectuated alternative-theory error retroactively. But they disagree as to whether the error was harmless, and indeed disagree on the method for determining harmlessness.

### E. Harmless Error

#### 1. *Chapman* / *Neder* / *Aledamat* & Federal Authorities

As the *Aledamat* court explained, for misdescription of elements and alternative-theory instructional error, we apply the harmless beyond a reasonable doubt standard in *Chapman v. California* (1967) 386 U.S. 18. (*Aledamat, supra,* 8 Cal.5th at p. 9.) The court clarified that, "no higher standard of review applies to alternative-theory error than applies to other misdescriptions of the elements. The same beyond a reasonable doubt standard applies to all such misdescriptions, including alternative-theory error." (*Ibid*.) In other words, there is no hybrid standard for determining harmlessness; rather, "*the usual* 'beyond a reasonable doubt,' " *Chapman* standard applies. (*Aledamat*, at p. 3, citing *Chapman*, at p. 24., italics added.)

Under that standard, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, *including the evidence*, and *considering all relevant circumstances*, it determines the error was harmless beyond a reasonable doubt." (*Aledamat,* at p. 3, italics added.) The reviewing court asks: " 'Is it clear beyond a reasonable doubt that a rational jury *would have* found the defendant guilty absent the error.' " (*People v. Merritt* (2017) 2 Cal.5th 819, 827, quoting *Neder v. United States* (1999) 527 U.S. 1, 18 (*Neder*), italics added; accord *Powell, supra*, 63 Cal.App.5th at p. 715.) As these pronouncements suggest, there is no one exclusive way to determine harmlessness.

Indeed, the *Aledamat* court cited several federal circuit court opinions that actually applied different methods of determining harmlessness for alternative-theory error under the *Chapman* beyond a reasonable doubt test.  (*Aledamat, supra*, 8 Cal.5th at p. 11.)  Four of those federal cases are pertinent here, in that they focused on whether the verdict "*would have been the same*" based the overwhelming nature of the evidence, instead of divining the theory the jury actually relied upon in reaching its verdict.

In *United States v. Skilling* (5th Cir. 2011) 638 F.3d 480 (*Skilling II*), the circuit court, after examining the record, found the alternative-theory error there was harmless beyond a reasonable doubt because the evidence underlying a valid theory was "overwhelming."  (*Id.* at p. 483.)  In *Skilling II*, the defendant had been convicted of various federal white-collar crimes, including conspiracy to commit honest-services fraud and securities fraud.  (*Id.* at p. 481.)  The United States Supreme Court subsequently invalidated the honest services fraud theory advanced at trial and remanded the case back to the circuit court to determine whether submitting the invalidated theory to the jury was harmless.  (*Ibid.*)[35]  On remand, the Government argued the error was harmless as to the conspiracy conviction, because the evidence established the defendant participated in a scheme to deceive the investing public and based on that, the court could conclude the jury would have convicted him under a valid theory:  conspiracy to commit securities fraud.  (*Id.* at p. 483.)

Treating the matter as alternative-theory error, the *Skilling II* court found the error harmless.  (*Skilling II, supra,* 638 F.3d at pp. 481, 488.)  Consistent with United States Supreme Court precedent, the *Skilling II* court focused on one way to prove an alternative-theory error harmless:  "as set forth in *Neder v. United States* . . . , an error is

---

[35]  The high court held that the honest-services fraud statute is limited only to schemes involving bribes or kickbacks, neither of which took place in *Skilling*.  (*Skilling v. United States* (2010) 561 U.S. 358, 408-409.)

harmless if a court, after a 'thorough examination of the record,' is able to 'conclude beyond a reasonable doubt that *the jury verdict would have been the same absent the error*.' [Citation.] *If the defendant 'raised evidence sufficient to support a contrary finding,' then the error was not harmless*. [Citation.] Thus, under the . . . *Neder* standard*, a reviewing court, 'in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to [an acquittal] with respect to the [valid theory of guilt].' "* (*Skilling II*, at p. 482, italics added.)[36]

The "crux of the matter,"[37] according to the *Skilling II* court was "whether, under the *Neder* standard, the evidence presented at trial proves that *Skilling* conspired to

---

[36] Another method of determining harmlessness for alternative-theory error, cited in *Skilling* is when "the jury, in convicting on an invalid theory of guilt, *necessarily found facts* establishing guilt on a valid theory." (*Skilling II*, *supra*, 638 F.3d at p. 482, italics added.) We discuss a similar method, *post*.

[37] Before addressing what it characterized as the "crux of the matter" in its analysis, the *Skilling II* court addressed what it called "preliminary matters" raised by the defendant. First, it rejected Skilling's claim that the fact the jury was instructed with two theories, one of which had been invalidated, was dispositive of the question of harmlessness. (S*killing II*, *supra*, 638 F.3d at p. 483.) The court reasoned that "the fact that the jury may have relied upon an invalid theory of guilt shows only that an alternative-theory error occurred, not that the error was not harmless." (*Ibid*.) Second, the court rejected Skilling's contention that the Government's closing argument made it more likely the jury convicted him of conspiracy based on the invalidated theory. (*Ibid*.) The court noted that the Government mentioned the invalidated theory regarding both defendants in rebuttal, but mentioned it only once as to Skilling. (*Ibid*.) "Further, it never argued that the jury should convict Skilling solely on the honest-services theory, nor did it tell the jury that it should disregard the evidence of securities fraud in reaching a conviction. This single reference to *Skilling's* honest services, in light of the Government's extensive argument on securities fraud, merely permitted the jury to decide the case on the wrong theory. It did not force or urge it to do so, and therefore, it shows only that an alternative-theory error occurred, not that the error was not harmless." (*Ibid*., italics added.) We discuss the prosecution's closing argument in the instant case, *post*.

commit securities fraud."**38** (*Skilling II*, *supra*, 638 F.3d at p. 483.)  It then went on to hold:  "Based on our own thorough examination of the considerable record in this case, we find that the jury was presented with *overwhelming evidence* that Skilling conspired to commit securities fraud, and thus we conclude beyond a reasonable doubt that the verdict would have been the same absent the alternative-theory error."  (*Skilling II*, at pp. 483-484, italics added.)

Similarly, in *United States v. Black* (7th Cir. 2010) 625 F.3d 386 (*Black*), another case involving the invalidated honest services theory, the prosecution had advanced a valid theory related to pecuniary fraud to prove mail and wire fraud.  The court

---

**38** In *Neder*, the trial court erroneously omitted an element of the offense.  The high court held the erroneous instruction was harmless.  (*Neder*, *supra*, 527 U.S. at p. 2.)  Based on its reasoning, *Neder* is often cited for the proposition that where a reviewing court concludes beyond a reasonable doubt that (1) the omitted element or elements were uncontested and (2) the evidence establishing the omitted element was overwhelming, the error is harmless.  (See *Merritt*, *supra*, 2 Cal.5th at p. 832; *People v. Mil* (2012) 53 Cal.4th 400, 410-411, 417.)  But while this was one way to establish harmlessness, the *Neder* court did not suggest it was the only way or set out these circumstances out as requirements.  The *Neder* court held:  "*In this situation*, where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." (*Neder*, at p. 17.)  The italicized portion of this quote — "In this situation" — suggests reasoning that was situational based on the circumstances in that case.  Similarly, the *Neder* court later stated that if, at the end of the reviewing court's examination of the record, "the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—*for example*, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless."  (*Id*. at p. 19.)  The italicized text — "for example" — again suggests circumstances where the error would not be harmless, but nothing the *Neder* court said limits a court's analysis in this regard when determining whether "it clear beyond a reasonable doubt that a rational jury *would have found* the defendant guilty absent the error."  (*Id*. at p. 18, italics added.)  Indeed, by highlighting the cited circumstances in *Neder* as an example, the high court implicitly acknowledged there could be other examples or methods of determining harmlessness.

explained: "[I]f it is not open to reasonable doubt that a reasonable jury *would have* convicted [defendants] of pecuniary fraud, the convictions on the fraud counts will stand." (*Id.* at p. 388, italics added.) On one count, the *Black* court concluded that the evidence of pecuniary fraud was "not conclusive" and reversed. (*Id*. at pp. 392-393.) However, as to another count, the court concluded, "the evidence of pecuniary fraud [was] so compelling that no reasonable jury could have refused to convict the defendants of it" and affirmed the conviction on that count. (*Id*. at p. 393.)

Our high court cited *Skilling II* and *Black* with apparent approval in *Aledamat*. (*Aledamat, supra*, 8 Cal.5th at p. 11.)[39] Thus, we see *Skilling II* and *Black* as examples of a proper method for determining harmlessness based on the nature of the evidence establishing a valid theory beyond a reasonable doubt.[40]

---

[39] In *Aledamat*, our high court cited *Skilling II* in rejecting the notion that there should be some hybrid method of determining harmlessness for alternative-theory error different from *Chapman*. The *Aledamat* court wrote: "As the court that reviewed the *Skilling* case on remand recognized, . . . the [high] court 'did not specifically identify the harmless-error standard that is applicable to alternative-theory errors, but it cited to a string of cases that apply a common harmless-error standard to other types of instructional errors' ." (*[] Skilling [II,]* [*supra*,] 638 F.3d [at p.] 481; see *id*. at p. 482 [applying the beyond a reasonable doubt standard].)" (*Aledamat, supra*, 8 Cal.5th at p. 11.) The *Aledamat* court cited *Black* along with a string of federal cases for the proposition that the "the same *Chapman* analysis of harmless error applies to alternative-theory error as applies to other kinds of misdescription of the elements." (*Ibid.*)

[40] Other courts, not cited in *Aledamat*, have applied the *Skilling II* overwhelming evidence approach. (See e.g., *United States v. Wright* (2019) 937 F.3d 8, 30, citing *Neder, supra*, 527 U.S. at p. 17 ["we are required to affirm the conviction if the evidence for either [valid] theory of guilt. . . was so " 'overwhelming . . . that the jury verdict would have been the same absent the error [Citations].' . . .We thus confine our harmless error analysis to determining whether the government has met its burden to show that the evidence [of the valid theory] was "overwhelming' "].) At least one other court has followed the *Skilling II* overwhelming evidence analysis in the context of aiding and abetting. In *Spriggs v. United States* (2012) 52 A.3d 878, the jury was presented with two theories on which the defendant could have been guilty of the charged burglary, either as a principal or as an aider and abettor. The defendant resided at the residence

46

Further, in two other federal circuit cases cited in *Aledamat,* the court employed a similar method for determining harmlessness for alternative-theory error under the beyond a reasonable doubt test: "[I]f the evidence that the jury necessarily credited in order to convict the defendant under the instructions given . . . is such that the jury must have convicted the defendant on the legally adequate ground *in addition to or instead of the legally inadequate ground,* the conviction may be affirmed." (*Bereano v. United States* (4th Cir. 2013) 706 F.3d 568, 578, italics added (*Bereano*) [addressing alternative-theory error related to the invalidated honest services theory of mail fraud and concluding that the evidence establishing the valid theory of pecuniary fraud was overwhelming]; *United States v. Jefferson* (4th Cir. 2012) 674 F.3d 332, 361 (*Jefferson*) [also addressing alternative-theory error based on the invalidated honest services theory].) As the court in *Jefferson* put it, "a reviewing court is not entitled to reverse a conviction *that could rest on either a valid or invalid legal theory* if the court can conclude 'beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " (*Jefferson*, at p. 361, citing *Neder, supra,* 527 U.S. at p. 18, italics added.)

In asserting the alternative-theory error was not harmless here, Roman relies upon *People v. Thompkins* (2020) 50 Cal.App.5th 365 (*Thompkins*). There, the issue addressed was whether the alternative-theory error stemming from our high court's clarification of the kill zone theory for attempted murder was harmless.[41] Rejecting the idea of evaluating whether a valid theory was supported by the evidence, the *Thompkins* court found the error was not harmless. It reasoned: "In assessing prejudice, *Aledamat*

---

where the burglary occurred, and the jury was misinstructed on the principal theory of liability related to his residence. Citing *Skilling II* and noting that if "after a thorough examination of the record, [the reviewing court] is able to conclude beyond a reasonable doubt that the jury verdict *would have been* the same absent error," the *Spriggs* court found the error harmless given that "the evidence of [defendant's] guilt under an aiding and abetting theory was overwhelming." (*Id.* at p. 886, italics added.)

[41] See *People v. Canizales* (2019) 7 Cal.5th 591.

considered *the likelihood that the jurors would have applied the erroneous instruction*, not simply the strength of the evidence to support a guilty verdict using the correct instruction.  [Citation.]  This focus on the impact of the erroneous instruction rather than the strength of the evidence of guilt is central to *Aledamat's* reasoning on prejudice.  *This is not the type of error that can be rendered harmless by 'overwhelming' evidence of guilt alone*."  (*Thompkins*, at p. 399, italics added.)

The *Thompkins* court acknowledged that our high court in *Aledamat* rejected a "more demanding standard of review" for alternative-theory error and instead held that: " 'The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt.' "  (*Thompkins*, *supra*, 50 Cal.App.5th at p. 399.)  But the *Thompkins* court went on to reason:  "As we understand the standard of review, the question is not whether we think it clear beyond a reasonable doubt that the defendants were actually guilty of five attempted murders based on the valid theory, but whether we can say, beyond a reasonable doubt, the jury's *actual verdicts were not tainted* by the inaccurate jury instruction.  *We focus on the likelihood that the jury relied on the kill zone instruction in reaching its verdicts, not simply the likelihood of defendants' guilt under a legally correct theory*."  (*Ibid*., italics added.)

To the extent that *Thompkins* can be read as requiring that its approach of focusing on the error's impact on the verdict must be applied in all cases, as Roman seems to argue, we disagree with that view for two reasons.  First, reviewing courts must "examin[e] the entire cause, *including the evidence*, and consider[] *all relevant circumstances*."  (*Aledamat*, *supra*, 8 Cal.5th at p. 3, italics added.)  And we must then ask:  "Is it clear beyond a reasonable doubt that a rational jury *would have* found the defendant guilty absent the error?"  (*Neder, supra,* 527 U.S. at p. 18; *Merritt*, *supra*, 2 Cal.5th at p. 827, italics added.)  Accordingly, there is no one way to establish

harmlessness for instructional error, including alternative-theory error. *Aledamat* teaches as much.

In our view, the *Thompkins* approach, if generically applied in all cases, would focus the analysis through an aperture that is too narrow. Indeed, the *Aledamat* court specifically rejected a narrow focus on the verdicts. It did so by clarifying its earlier statements in in *People v. Chiu* (2014) 59 Cal.4th 155 and *In re Martinez* (2017) 3 Cal.5th 1216, regarding the harmless error standard applied in alternative-theory error cases. In *Martinez*, the court stated that alternative-theory error, "requires reversal unless the reviewing court concludes beyond a reasonable doubt that the jury actually relied on a legally valid theory in convicting the defendant of first degree murder." (*Martinez*, at p. 1218, *Chiu*, at p. 167 [same]) But the *Aledamat* court clarified that the *Chiu/Martinez* means of determining harmlessness was not exclusive and, "*Chiu* and *Martinez* were only a specific application of the more general reasonable doubt test stated in cases like *Neder* [Citation] and *Merritt* [Citation]." (*Aledamat*, *supra*, 8 Cal.5th at p. 12.) "[T]he reviewing court is not limited to a review of the verdict itself. An examination of the actual verdict may be sufficient to demonstrate harmlessness, but it is not necessary. In both *Chiu* and *Martinez*, we examined the record and found that it affirmatively showed the jury might have based its verdict on the invalid theory. *Because no other basis to find the error harmless beyond a reasonable doubt was at issue, we did not explore whether other ways of finding the error harmless existed. Those cases merely provide one way in which a court might evaluate harmlessness. They do not preclude other ways*." (*Id*. at p. 13, italics added.)

Similarly, the *Aledamat* court's method of determining harmlessness in the circumstances of that case — a method it characterized as "[a] *nonexclusive* way the error

can be found harmless beyond a reasonable doubt" — only illustrates one example of how harmlessness can be determined. (*Aledamat*, *supra*, 8 Cal.5th at pp. 14-15.)[42]

Second, the federal circuit court cases cited by our high court in *Aledamat* with apparent approval identified different methods for determining harmlessness. As we have seen, those methods focused on whether the verdict "*would have been the same*" based the overwhelming nature of the evidence, as opposed to divining the theory the jury relied upon in arriving at its verdict. Because the *Aledamat* court cited these federal circuit court cases, we apply their persuasive analysis here.

## 2. Analysis – Harmlessness of the Alternative-Theory Error

We regard the evidence of Roman's culpability as a direct aider and abettor of implied malice murder to be overwhelming, such that the jury would have found him guilty absent the error. We first examine some fundamental rules concerning

---

[42] Moreover, our high court in *Aledamat* did not focus on the likelihood that the jury "would have applied the erroneous instruction" as suggested in *Thompkins*. In *Aledamat*, the alternative-theory error related to the trial court's instruction on the definition of "deadly weapon" in the assault with a deadly weapon instruction. It was alleged that a box cutter wielded by the defendant was the deadly weapon. The instruction told the jury an implement could be a deadly weapon either because it is "inherently deadly *or* deadly in the way defendant used it." (*Aledamat*, *supra*, 8 Cal.5th at p. 6, italics added.) Because a box cutter is not inherently deadly, it was error to give the jury that alternative theory. (*Ibid*.) The circumstances the *Aledamat* court focused upon in concluding that the error was harmless related primarily to the elements for assault with a deadly weapon in the instructions. It reasoned that defendant's argument on appeal for prejudice presupposed that under the instructions, the jury would believe there were two ways it could find the box cutter to be a deadly weapon – inherently deadly and how the defendant used it. (*Id*. at p. 13.) However, the court concluded it was "unlikely" the jury would so view the instructions. (*Ibid*.) It reasoned that under the instructions (we need not detail here), it seemed "unlikely the jury would simply view the box cutter as inherently deadly without considering the circumstances, including how defendant used it." (*Id*. at p. 14.) The opinion, contrary to the interpretation of the *Thompkins* court, did not consider "the likelihood that the jurors would have applied the erroneous instruction." (See *Thompkins*, *supra*, 50 Cal.App.5th at p. 399.) It considered whether under the instructions given, the jury would have found the weapon inherently dangerous without also finding it was deadly in the way defendant used it. (*Aledamat*, at pp. 14-15.)

circumstances supporting a finding of aider and abettor liability and then examine the evidence establishing the elements of aiding and abetting implied malice murder.

### a. Aiding and Abetting Circumstances to Consider

Aiding and abetting may be shown by circumstantial evidence. It is well-settled that the presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense, including flight, are relevant to determining whether a defendant aided and abetted in the commission of the crime. (*People v. Lara* (2017) 9 Cal.App.5th 296, 322 (*Lara*); *People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *People v. Singleton* (1987) 196 Cal.App.3d 488, 492; See also CALCRIM No. 401.)[43]

Regarding companionship, Ruslan and Roman are brothers who, according to Roman, lived together. As for conduct before the murders, the two brothers conspired to commit early morning auto burglaries and took property from vehicles (along with a third person). Together, they then evaded law enforcement in an effort to escape apprehension. During this earlier evasion, Roman drove the get-away vehicle, engaging in the same type of reckless and dangerous driving conduct Ruslan later employed. Together, the two brothers were involved in a serious crash resulting from Roman's dangerous driving conduct and thereafter fled the crash scene together. Then, together they commandeered a second get-away vehicle, stealing a truck. After the crash resulting in the murders, they again fled the crash scene together. Regarding failure to prevent the crime, at no time prior to the fatal crash did Roman try to stop Ruslan's reckless and dangerous driving. Even though the evidence establishes that Roman's own life was endangered by his brother's driving conduct, he could not remember ever asking Ruslan to stop or slow down.

---

[43] It is also well-settled that mere presence at the scene of a crime is not sufficient in and of itself to constitute aiding and abetting, nor is the failure to take action to prevent a crime. (*Lara*, *supra*, 9 Cal.App.5th at p. 322.)

Motive is another circumstance to be considered in determining aiding and abetting liability. (See *People v. Rogers* (1985) 172 Cal.App.3d 502, 514 [helping the actual perpetrator because of a "familial concern" is a motive to aid and abet].) Aside from avoiding apprehension for the auto burglaries, Roman had a personal motive to aid and abet his brother's reckless driving conduct; Roman, by his own admission, did not want to go to jail on his own outstanding warrant.

The evidence establishing all of these circumstances is uncontroverted. We shall now discuss the evidence that is pertinent to the elements of aiding and abetting implied malice murder.

### b. The Actus Reus

Again, "to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*." (*Powell*, *supra*, 63 Cal.App.5th at p. 713.) Here, the life-endangering act Roman aided was Ruslan's driving conduct during the brothers' ongoing effort to evade law enforcement and avoid apprehension.

There can be no serious argument that Ruslan's driving conduct constituted an act, the natural and probable consequences of which were dangerous to human life and that this conduct was the proximate cause of the death of two people. As noted, one pursuing deputy opined that it was more dangerous to drive at high speeds on surface roads as opposed to the freeway because of intersections, potential pedestrians and bicyclists, especially at 6:30 a.m. on a weekday. He further opined that it was luck that the truck did not collide into a vehicle crossing the several intersections they went through on Antelope Road before the crash.

Although the defense expert disagreed with the prosecution expert as to the precise speed at the point of impact, the defense expert nevertheless agreed that the truck was travelling on this surface street at a speed in excess of the speed limit on the freeway they had just exited. And both experts agreed that just one and one half seconds before the

52

collision, the truck was travelling at 93 miles per hour; the posted speed limit was 45 miles per hour.  As one eyewitness put it, the truck was travelling like "a bat out of hell." Indeed, before the crash that witness thought the truck might flip over because of its speed and the wet pavement.

But as our high court has stated, " '[a]n aider and abettor must do something' " to be culpable.  (*Powell*, *supra*, 63 Cal.App.5th at p. 712, quoting *McCoy*, *supra*, 25 Cal.4th at p. 1117.)  So, what did Roman do?  The evidence established, through his own admission, that when his brother asked where they should go, he said they should get off the freeway at Antelope Road because they knew the area.  The evidence conclusively satisfies the actus reus requirement for an aider and abettor here.

### c. The Mens Rea

As noted, "[t]he mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life."  (*Powell*, *supra*, 63 Cal.App.5th at p. 713; accord *Langi*, *supra*, 73 Cal.App.5th at p. 983; *Valenzuela*, *supra*, 73 Cal.App.5th 501.)  Like all elements of a crime, the mens rea elements of implied malice murder can be proven by circumstantial evidence.  (*Valenzuela*, at p. 502.)  We find the evidence of the required mens rea elements to be overwhelming here.

The evidence establishes that Roman knew his brother intended to continue driving recklessly when he offered the advice about where to go.  In fact, when he gave that advice, Ruslan was driving recklessly on the freeway, including at some point, attempting to evade the police by using the emergency lane next to the center divider. Nothing suggests Roman expected Ruslan to change his behavior when he told him to exit at Antelope.  As for their plans once on Antelope, all Roman said was "[w]e didn't know *where to go* from there."  (Italics added.)  Roman's reference to "where to go from there" without any qualification of how they would get there shows he expected Ruslan

to continue his evasion of the pursuing deputies. Indeed, Roman never told his brother to slow down. His own statement explains why. Asked whether they were trying to get away from law enforcement during the evasion in the truck, Roman said, "Not from the cops. *I* just wanted to, not from the cops in general. *I* just, *I* didn't want to go to jail." (Italics added.)

The totality of this evidence gives rise to only one reasonable inference: Roman expected his brother to continue their reckless flight to avoid apprehension for their earlier crimes and keep himself from going to jail on his warrant. Likewise, Roman's advice to get off at Antelope could only have been done with intent to aid Ruslan's reckless and dangerous driving conduct.

We further conclude the evidence is also overwhelming as to Roman's knowledge that Ruslan's driving conduct was dangerous to human life and that Roman acted in conscious disregard for human life when he advised Roman where to go. Again, Roman had earlier driven them into what was described as an "[e]xtremly violent crash." This was less than an hour and a half before the fatal collision in the 6:30 a.m. commuter traffic. This circumstance is significant in establishing Roman's risk awareness and conscious disregard. (See *Watson*, *supra*, 30 Cal.3d 290, 293-294, 301 [that the defendant had nearly collided with another vehicle before the fatal crash was considered significant proof of risk awareness and conscious disregard].)

Moreover, we may look to the reason Roman gave for the specific advice he gave his brother in determining his awareness of the risk of death to people in their flight path. Roman said they knew the area. This means that he had to have known that Antelope Road was a surface street with traffic lights controlling major intersections. Indeed, Roman's own accident reconstruction expert testified that the two brothers lived only a little more than a mile from the collision scene. And on cross-examination, the expert opined that a hypothetical person living in the proximity of the collision scene would be

54

familiar with the roadway, and when going over the overpass, would know about the existence of the intersection where the collision occurred.

Additionally, Roman admitted to investigators that he knew it was dangerous to speed and evade the police. He said he saw lights flashing and when asked what a person is supposed to do when they see police lights, Roman said, "You're supposed to pull over." He said they were scared because "there's so much [*sic*] cops after us." But he claimed they were only travelling at 50 to 60 miles per hour on Antelope Road. He knew this because he looked at the speedometer. And, according to Roman, after Ruslan hit the brakes, they slowed to "about like thirty-five" at the point of the collision. Asked whether he thought it was safe to drive at 50 or 60 miles per hour in that area, Roman said, "at some points, no." When then asked if Ruslan also knew it was dangerous, Roman said he did and added, "I mean, I'm sure. He's not stupid."

Notably, all witnesses testified the truck was travelling much faster than Roman admitted and indeed, the air bag module recorded the speed at 93 miles per hour just a second and a half before the collision. Giving a false statement evincing consciousness of guilt is another circumstance tending to prove aiding and abetting. (*Lara*, *supra*, 9 Cal.App.5th at p. 322.) More to the point here, regarding risk awareness, Roman's false statement as to speed demonstrates he personally appreciated the risk of death posed by his brother's excessive speed and tried to downplay it by claiming they were not going as fast as they were.

Finally, the brothers' conduct after the fatal collision show their disregard for the risk their conduct presented to human life. In response to a question from one of the jurors, the primary pursuing deputy testified that after colliding into the Kia at a high rate of speed and pushing it an estimated 45 yards, the two occupants of the truck fled from the scene without checking on the occupants of the Kia. This conduct was consistent with the prosecutor's closing argument theme: Roman and Ruslan did not care whether they endangered or hurt anyone during the flight from law enforcement.

55

In our view, no reasonable inference can be drawn from this evidence other than Roman aided and abetted implied malice murder. Stated differently, we see no evidence "sufficient to support a contrary finding," i.e., no evidence "that could rationally lead to [an acquittal] with respect to the' " valid theory of aiding and abetting implied malice. (*Skilling II*, *supra*, 638 F.3d at p. 482.) It is thus clear "beyond a reasonable doubt that a rational jury *would have* found the defendant guilty absent the error" occasioned by the retroactive alternative-theory error here. (See *Neder*, *supra*, 527 U.S. at p. 18; *Merritt, supra,* 2 Cal.5th at p. 827; *Powell*, *supra*, 63 Cal.App.5th at p. 715, italics added.)

### d. The Facts Supporting the Jury's Verdict of Willful Evasion of a Peace Officer with Wanton Disregard

Not only is the evidence supporting the valid theory here overwhelming, but that evidence is the very same evidence the jury had to have credited in finding that defendant aided and abetted the target crime for the natural and probable consequences theory — evading a peace officer with wanton disregard for safety. Thus, we conclude from this additional circumstance that the jury *would have* convicted the defendant on the legally valid ground in addition to the legally invalid theory. (See *Bereano, supra,* 706 F.3d at pp. 578-579 [Reasoning that "[a] conviction based on honest services fraud necessarily acknowledges that the jury accepts as true the scheme the Government has alleged, that Bereano knowingly took advantage of his client[s'] trust by sending them false bills. *In accepting that this scheme took place, the jury also necessarily accepted that Bereano knowingly obtained his clients' money by false pretenses, a finding that equates to a conviction for pecuniary fraud*"].)

First, we note that Roman's jury was instructed it had to find beyond a reasonable doubt that Ruslan committed second degree murder before it could convict Roman based on the natural and probable consequences theory. And given that there was no evidence of intentional murder and the prosecutor argued the murder was based on implied malice, Roman's jury necessarily concluded Ruslan committed implied malice murder and in

doing so necessarily concluded that his driving conduct was life endangering and that it caused the death of the victims.

Second, the jury had to have found that Roman did something to aid and abet the target crime. The act Roman performed to aid that crime is the same act supporting culpability for aiding and abetting implied malice murder – he advised Ruslan to get off the freeway at an exit where they knew the area.

While we note the element of wanton disregard in the evading offense is not limited to the safety of persons — it can be either the wanton disregard of the safety of persons *or property* and the jury was so instructed — no rational jury could have concluded from the evidence here that the driving conduct in the truck only risked the safety of property; many people on Interstate 80 and Antelope Road that morning were clearly endangered during the flight in the truck and two people were ultimately killed.

We also acknowledge that the wanton disregard element can be established by the commission of three or more Vehicle Code violations and those violations need not be life endangering in the abstract.[44] But the evidence demonstrated that the commission of those offenses here was life endangering. Consequently, it is clear that the evidence the jury must have credited and relied upon to find culpability for the target offense under

---

[44] Regarding evading a peace officer with wanton disregard for safety, the jury was instructed in pertinent part: "A person acts with *wanton disregard for safety* when (1) he or she is aware that his or her actions present a substantial and unjustifiable risk of harm, [and] (2) he or she intentionally ignores that risk. [¶] *Driving with willful or wanton disregard for the safety of persons or property* includes, but is not limited to, causing damage to property while driving or committing *three or more violations that are each assigned a traffic violation point*. [¶] Driving at an Unsafe Speed (Vehicle Code § 22350), Driving in Excess of Posted Speed Limit (Vehicle Code § 22348), Unsafe Lane Change (Vehicle Code § 21750), and Failure to Drive on the Right Side of the Roadway (Vehicle Code § 21650) are each assigned a traffic violation point." (Italics added.)

any theory of that offense, was the same evidence establishing Roman's culpability for implied malice murder.[45] (See in *Bereano, supra,* 706 F.3d at p. 578.)

### e. The Prosecution's Closing Argument

In arguing that the alternative-theory error here was not harmless beyond a reasonable doubt, Roman relies upon two isolated excerpts of the prosecution's initial closing argument. He argues that because the prosecutor argued the natural and probable consequences theory was the "easiest" and "cleanest" way to second degree murder, he was prejudiced because we cannot say beyond a reasonable doubt that the jurors did not rely on that now invalidated theory to arrive at their verdict.

But while a showing that the jury did not rely on the invalidated theory in reaching its verdict would establish harmlessness, again that is not the only way harmlessness can be established. (*Aledamat*, *supra*, 8 Cal.5th at p. 13.)

---

[45] To be clear, we do not conclude that because the jury found the target offense, it necessarily found implied malice murder as a matter of law. As noted, evading a peace officer with wanton disregard for safety can be committed without endangering people. Risk of danger to and damage to property or three or more Vehicle Code violations are sufficient. Thus, the elements of the target offense and implied malice do not align in the abstract and a finding of culpability as to the target offense here does not *necessarily* equate to a finding of implied malice. (See *People v. Howard* (2005) 34 Cal.App.4th 1129.) Our conclusion here is based on the *evidence* the jury must have accepted in the context of this case to conclude Roman aided and abetted the target offense, not on the elements the jury necessarily found as to the target offense. Accordingly, while we employ an analysis here that is similar to the analysis in *Aledamat*, we do not employ the precise method that court used to determine harmlessness: "The reviewing court examines *what the jury necessarily did find* [as to specific elements] and asks whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well." (*Aledamat*, *supra*, 8 Cal.5th at pp. 14-15, italics added [Concluding that no reasonable jury that made all of the findings necessary to find the elements of assault with a deadly weapon could have failed to find that defendant used the box cutter in a way that is capable of causing or likely to cause death or great bodily injury].)

The prosecutor's argument, is nevertheless a pertinent circumstance that should be considered in determining whether an error is harmless. (*Powell*, *supra*, 63 Cal.App.5th at p. 172 [concluding that the instructional error as to aiding and abetting implied malice murder was harmless as to the defendant because the prosecutor did not argue he was culpable under that theory and argued implied malice only as to the codefendant].) But rather than focus on the two snippets highlighted by defendant, we have examined the entirety of the prosecutor's argument concerning the two second degree murder theories. Our review reveals his discussion focused on direct aiding and abetting implied malice at least as much as the natural and probable consequences theory. Moreover, his theme from the beginning of the trial was that Roman and his brother did not care about the risks posed to others by their flight, a theme consistent with the conscious disregard for the risk of death element of implied malice murder.

The prosecutor began his initial closing argument with this same theme: "The defendant and his brother could care less who was on the roadway at 6:30 in the morning as they were driving . . . at almost 100 miles per hour through commute traffic. Certainly didn't care that the road they were about to get off on was much more congested and . . . was much more higher likely [sic] to end in the tragedy that we've got in this case. [¶] The defendant and his brother could care less as they drove this truck into this small car at speeds between 74 to 80 miles per hour. They didn't care that [the victims] were dying in that car as they got out and they kept running."

Later, in discussing the murder counts, the prosecutor explained there were two degrees of murder the jury was to consider, first degree felony murder based on the burglary during which the keys for the truck were stolen and second degree murder based on implied malice murder. In describing the second degree murder theory, the prosecutor told the jury there were "two different ways that a defendant is guilty of second-degree murder. One is he is an aider and abettor to Ruslan's implied malice murder. He is directly aiding and abetting Ruslan in committing a second-degree murder. [¶] And the

other way is this natural and probable consequence. This is sort of the least common denominator under these facts. I think it is the easiest to get to and it's clearest to get to second-degree murder for Defendant Roman under this aider and abettor to natural and probable consequence. [¶] But in order to determine . . . the defendant is guilty, you have to determine if Ruslan's guilty of second-degree murder because you can't aid and abet a crime that never happened. So you have to first say, 'Did Ruslan commit a second-degree murder by implied malice?' "

After discussing the relevant evidence establishing Ruslan's culpability for implied malice murder, the prosecutor then turned to Roman's culpability as a direct aider and abettor by first posing the following questions: "[W]hat was Roman's state of mind? Did Roman encourage this?" He then discussed some of the circumstances we discussed *ante* answering these questions and establishing Roman's culpability for aiding and abetting implied malice murder, including Roman's advice to get off the freeway at Antelope. The prosecutor emphasized that it was this advice "that brought Ruslan's driving in direct conflict with" the Kia. The prosecutor argued Roman "didn't care any more than Ruslan did" and further argued, "[t]hey don't care if they kill. That's murder under the second degree."

Turning to the alternative theory, the prosecutor then stated, "so that's one way. It's even easier to get to second-degree murder through what's known as a natural and probable consequence doctrine." After discussing the evidence establishing the target offense of evading a peace officer with wanton disregard, the prosecutor again posed the question, "did Roman encourage that?" He answered his question by telling the jury, "Again, look at the *at the same thing*" and reiterated the argument he had made concerning implied malice murder, emphasizing Roman's advice to get off at Antelope Road. He told the jury the brothers went from the freeway to "a more congested road" and argued it was "just a matter of time when there is an awful tragedy, and that's exactly what happened."

60

Critically, the prosecutor's argument as to each second degree murder theory focused on the same evidence — or as the prosecutor put it, "the same thing." Similar to *Skilling II*, we conclude that the fact the argument permitted the jury to decide the case based on two theories, one of which was later invalidated, "shows only that an alternative-theory error occurred, not that the error was not harmless." (*Skilling II*, *supra*, 638 F.3d at p. 483.) And like in *Skilling II*, the evidence of the valid theory was overwhelming. Moreover, the evidence the prosecutor focused upon and that the jury must have credited to conclude that defendant aided and abetted the target crime was the same that established his culpability for aiding and abetting implied malice murder. (See *Bereano, supra,* 706 F.3d at p. 578 and *Jefferson, supra,* 674 F.3d at p. 361.)

Accordingly, we are not persuaded by Roman's contention that the prosecutor's argument here prejudiced him.

### f. Conclusion – Retroactive Alternative-Theory Error

Applying *Chapman*, *Neder*, *Aledamat* and the federal circuit cases we have discussed, we conclude beyond a reasonable doubt that a rational jury would have found Roman guilty absent the retroactive alternative-theory error occasioned by Senate Bill 1437.

### 3. Analysis – Harmlessness of the *Powell* Error

As our high court has noted, the same standard of review that applies to alternative-theory error applies to other misdescriptions of the elements. (*Aledamat*, *supra*, 8 Cal.5th at p. 9.) Erroneous aiding and abetting instructions are treated the same as misdescription of elements. (See *Neder*, *supra*, 527 U.S. at p. 14, quoting *California v. Roy* (1996) 519 U.S. 2, 5 [noting that the failure to instruct that the jury could convict the defendant as an aider and abettor only if it found that the defendant had the intent or purpose of aiding the perpetrator's crime is an error that " 'could be 'as easily characterized as a 'misdescription of an element' of the crime, as it is characterized as an error of 'omission' " '].)

Accordingly, we apply the same analysis in determining harmlessness as to the *Powell* instructional error we discussed *ante* and conclude the error was harmless. Again, we ask: "Is it clear beyond a reasonable doubt that a rational jury *would have* found the defendant guilty absent the error?" (*Neder*, *supra*, 527 U.S. at p. 18; *Merritt*, *supra*, 2 Cal.5th at p. 827; *Powell*, *supra*, 63 Cal.App.5th at p. 715.) And we conclude, based on the overwhelming evidence discussed *ante* that Roman's jury would have convicted him of second degree murder based on a properly instructed implied malice theory if it had not been instructed on the now invalidated natural and probable consequences theory.

**4. Conclusion**

We conclude that both the retroactive alternative-theory error and *Powell* instructional error here are harmless beyond a reasonable doubt.

## VIII.  Consecutive Term Sentencing

Roman next contends the trial court abused its discretion in imposing consecutive terms for his two second degree murder convictions. He argues concurrent terms are mandated by California Rule of Court, rule 4.425 (rule 4.425), as well as the body of law recognizing that individuals Roman's age think differently than adults and are thus less culpable. We disagree.

### A.  Additional Background

In imposing two consecutive 15-year-to-life terms for the second degree murder convictions, the trial court explained that it had considered all the factors under rule 4.425: "I know his youth, drug addiction, no history of violent crimes. All of that was certainly taken into consideration."[46] But focusing on the two victims, the court noted

---

[46] Roman's counsel had provided a statement in mitigation emphasizing Roman's youth and attached reports chronicling interviews with Roman's friends who described Roman as drug free until he suffered a 2011 car crash and was prescribed pain medication. At sentencing, Roman's counsel urged consideration of Roman's youth: "The conduct of Roman Glukhoy and his brother … shows a lack of maturity, a lack of an appreciation of

Roman's decisions had "left a trail of destruction and devastation." And Roman and Ruslan had had "multiple opportunities, when they were stopped, to make different decisions."

The court continued, "[d]o we consider his youth? Yes. The Code requires that I consider all those factors, and I certainly have … in reaching this conclusion. [¶] But one of the major issues for me is not … if it was one impulsive act, if it was one impulsive decision, things would be different. But this was not one impulsive act. This was repeat[ed] acts."

## B. Analysis

On appeal, Roman argues the trial court abused its discretion because it did not comply with rule 4.425. Rule 4.425 directs the court to consider whether "(1) The crimes and their objectives were predominantly independent of each other; (2) The crimes involved separate acts of violence or threats of violence; or (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." The rule also allows the court to consider "[a]ny circumstances in aggravation or mitigation" so long as the circumstance was not used to impose the upper term, enhance the sentence, or is an element of the crime. (Rule 4.425.)

To those factors, Roman avers that the two murders were not predominantly independent of each other, nor did they involve separate violent acts, as the crash happened in an instant. He also takes issue with the court's reference to his repeated acts, arguing the court was considering his crimes committed before the murders. He adds that in mitigation, he could be considered a passive participant for the following reasons: he

_____

risk, a lack of impulse control, things that are consistent with adolescent thinking, and things that they can't proceed in life thinking that way." He also cited Roman's remorse.

63

was not driving, as a drug addict he was suffering from a mental and physical condition reducing his culpability, and — as the most important mitigating factor — he was young.

To that, Roman explains that the court failed to fully understand and factor in his adolescent brain. He asserts that biological research on brain development shows 19-year-olds have profoundly different decision making and cites *Roper v. Simmons* (2005) 543 U.S. 551, itself citing general differences between adults and juveniles under 18. The *Roper* court explained that juveniles have " '[a] lack of maturity and undeveloped sense of responsibility,' " are more vulnerable to negative influence and pressure, and possess a less well formed character. (*Id*. at pp. 569-570.) In holding the death penalty for minors under 18 unconstitutional, the Court articulated: "From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." (*Id.* at p. 570.) Roman maintains that *Roper* illustrates why "[n]either [he], [nor] his identical twin brother, subjectively appreciated that evading police by speeding in commuter traffic was so dangerous that someone could be seriously injured or killed."

We conclude the trial court acted within its discretion. " '[A] trial court has discretion to determine whether several sentences are to run concurrently or consecutively. [Citations.] In the absence of a clear showing of abuse, the trial court's discretion in this respect is not to be disturbed on appeal.' " (*People v. Caesar* (2008) 167 Cal.App.4th 1050, 1059 disapproved of on other grounds by *People v. Superior Court* (*Sparks*) (2010) 48 Cal.4th 1, 18.) " ' "The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary." ' " (*People v. Sperling* (2017) 12 Cal.App.5th 1094, 1103.)

Here, Roman makes no such showing. Though the fatal collision impacted both victims simultaneously, the trial court could properly consider the fact that there were two victims in imposing consecutive terms. (See *People v. Leon* (2010) 181 Cal.App.4th 452, 468 ["A trial court has discretion to impose consecutive sentences where … a single

act has resulted in crimes against multiple victims"]; *People v. Valenzuela* (1995) 40 Cal.App.4th 358, 365 [consecutive sentences properly imposed on two counts of vehicular manslaughter based on a single act of driving while under the influence, colliding into a car, and killing two occupants].)[47]  Further, the trial court did not, as Roman contends, consider Roman's other offenses; it simply noted that the brothers' conduct was not the result of a single impulsive act.  Rather, Roman had had many opportunities to discontinue his dangerous conduct, including during the truck chase.  And none of his proffered mitigating factors render the trial court's ruling an abuse of discretion.  Indeed, the trial court expressly considered the factors in rule 4.425, including Roman's youth.  It found Roman's youth insufficient to warrant concurrent terms.  And nothing in the record indicates Roman or Ruslan, at 19, were incapable of understanding that their reckless high speed driving could be fatal.

Moreover, we note there are numerous other aggravating factors that supported consecutive terms; thus, any error was harmless.  (See Cal. Rules of Court, rule 4.425 ["Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences"]; *People v. Davis* (1995) 10 Cal.4th 463, 552 ["Only one criterion or factor in aggravation is necessary to support a consecutive sentence"].)  Roman was on both adult informal probation and juvenile probation during the crash.  As reflected in the probation report, his convictions have

---

[47]  And while Roman maintains his crimes did not, as the probation report reflected, indicate planning, sophistication, or professionalism, the record suggests otherwise. Roman selected a "safe" place and time to burglarize cars, noting the rain would conceal their activities.  And he and Ruslan were able to evade numerous pursuing officers for a significant period of time.

increased in seriousness.[48]  And Roman's highly reckless conduct in driving the BMW indicates he represents a serious danger to society.

In sum, the trial court acted well within its discretion in imposing consecutive terms.

### IX.  *Franklin* Hearing

Roman contends remand is required for a hearing pursuant to *Franklin*, *supra*, 63 Cal.4th at page 277.  He also argues, in the alternative, that his trial counsel rendered ineffective assistance in failing to request a *Franklin* hearing.  We find no error.

Section 3051 establishes a parole eligibility mechanism for those serving sentences for crimes committed as juveniles.  (*Franklin, supra*, 63 Cal.4th at p. 277.)  It affords the opportunity for release during the 15th, 20th, or 25th year of incarceration (depending on the controlling offense) by showing rehabilitation and gained maturity. (*Ibid*.)

In *Franklin*, the defendant was sentenced prior to section 3051's enactment. (*Franklin, supra*, 63 Cal.4th at p. 276.)  Our high court remanded so the trial court could determine whether Franklin had had a sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing.  (*Id.* at p. 284.)  The court noted, "[a]ssembling such statements 'about the individual before the crime' is typically a task more easily done at or near the time of the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away."  (*Id.* at pp. 283-284.)

---

[48] Roman's prior offenses, including carrying a concealed stolen weapon and receipt of stolen property, date back to 2012 and continue to 2013 (the murders occurred in April 2014).

Here, Roman was sentenced to an indeterminate term of less than 25 years to life for his controlling offense and is entitled to a parole hearing during his 20th year of incarceration. (§ 3051, subd. (b)(1).) But unlike in *Franklin*, Roman was sentenced after section 3051's enactment and eight months following *Franklin*'s issuance. And we presume defense counsel and the court were aware of the applicable law, including *Franklin*.[49] (See *People v. Barrett* (2012) 54 Cal.4th 1081, 1105 ["Counsel is presumed competent and informed as to applicable constitutional and statutory law"].)

Further, unlike in *Franklin*, where it was unclear if Franklin had had the opportunity to put information relevant to a future parole hearing on the record, here, the record indicates Roman had that opportunity and he took advantage of it. At sentencing, Roman's trial counsel provided a statement in mitigation noting Roman's age during the crash and attached reports describing interviews with Roman's friends who reported Roman had been drug free until he was prescribed pain medication following a 2011 car accident. And at sentencing, Roman's counsel argued at length regarding Roman's youth: "The conduct of Roman Glukhoy and his brother … shows a lack of maturity, a lack of an appreciation of risk, a lack of impulse control, things that are consistent with adolescent thinking, and things that they can't proceed in life thinking that way."

Thus, unlike in *Franklin*, Roman was afforded an opportunity to present evidence relevant to a future youthful offender parole hearing — and such evidence was presented. (See *People v. Woods* (2018) 19 Cal.App.5th 1080, 1088-1089 [ "unlike the defendant in *Franklin*, defendant had both the opportunity and incentive to put information on the record related to a future youth offender parole hearing"].) And for this same reason,

---

[49] Indeed, two days before sentencing, Roman's counsel was present at a hearing where Ruslan's counsel cited section 3051 to the trial court: "Based on the way the laws have been evolving regarding youthful offenders, and 3051 in particular allows for parole on youthful people that were sentenced before they were to turn 23 . . . ."

Roman's trial counsel did not render ineffective assistance in failing to request a *Franklin* hearing.

To the extent Roman's claim of ineffective assistance is construed as challenging his counsel's failure to include all relevant information, we conclude that it too fails. Roman avers that his trial counsel failed to provide "*sufficient evidence* concerning [Roman's] level of maturity, cognitive ability, or other youth-related factors." (Italics added.) He adds that counsel failed to offer "all the mitigating evidence" relevant to a future hearing. But these vague averments leave us to speculate as to what such evidence might be. Roman does not say. Nor does he even suggest what or how much information would be "sufficient." Without showing what evidence counsel neglected to present and whether that evidence was available, defendant has not carried his burden of showing a reasonable probability of a better outcome.

Roman, undeterred, cites *People v. Tran* (2018) 20 Cal.App.5th 561, which rejected the People's argument that the defendant's failure to explain exactly what information he would have provided at a *Franklin* hearing, rendered remand unnecessary. (*Id.* at p. 570 ["Not knowing what their investigative efforts might turn up, it would be unrealistic to expect them to make an offer of proof at this stage of the case"].) But *Tran* does not apply here. Like in *Franklin*, Tran was sentenced before section 3051's enactment, hence trial counsel had no cause to consider what information to provide. (See *id.* at p. 570 ["because appellant's sentencing hearing preceded Franklin, it is doubtful he would have been permitted to present evidence bearing on his future suitability for parole, even if he had asked the trial court to do so"].) Here, by contrast, sentencing occurred well after section 3051's enactment, and the record gives every indication that trial counsel did consider and in fact presented information relevant to a future parole hearing. Thus, no showing of ineffective assistance has been made. If Roman can offer more than speculation that some information useful to the parole authorities could have been introduced and preserved in the trial court, he can seek to do

68

so by filing a petition for writ of habeas corpus. (See *People v. Sepulveda* (2020) 47 Cal.App.5th 291, 299-302 [rejecting defendant's claim of ineffective assistance of counsel related to provision of *Franklin* materials and noting that the claim could be presented in a petition for writ of habeas corpus, which would allow defense counsel to explain his decisions].)

For now, Roman's contention on appeal fails.

## X. Dueñas

In a supplemental brief, defendant contends remand is required for an ability to pay hearing with respect to the fines and fees imposed at sentencing. He cites in support *Dueñas*, *supra*, 30 Cal.App.5th 1157, which held that due process requires the trial court to stay execution of restitution fines, as well as court operation and conviction assessments, until it has held a hearing and determined the defendant has the present ability to pay.

We join courts concluding Dueñas was wrongly decided and hold that defendant was not entitled to an ability to pay hearing for the conviction and operation assessments. (*People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 860; *People v. Cota* (2020) 45 Cal.App.5th 786, 794-795; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted November 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055; *People v. Caceres* (2019) 39 Cal.App.5th 917, 923-929.) We therefore reject the contention.

## XI. The Abstract of Judgment

Finally, the parties agree the abstract of judgment must be corrected to reflect the fees imposed. At sentencing, the trial court orally imposed a $160 court operations assessment (§ 1465.8). Yet the abstract of judgment reflects a $260 operations assessment. Agreeing with the parties, we will order the abstract corrected. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment"].)

## DISPOSITION

As to Roman Glukhoy, the trial court is directed to prepare a corrected abstract of judgment reflecting the imposition of a $160 court operations assessment (Pen. Code, § 1465.8). As to both defendants, we otherwise affirm the judgments.


_____/s/_____
MURRAY, J.*


We concur:


_____/s/_____
HOCH, Acting P. J.


_____/s/_____
KRAUSE, J.

_____

\* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

70